# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2008 MAR 21  A 11: 47

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

|  |  |  |
|---|---|---|
| POTOMAC REALTY CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:08-CV-204-MEF |
| | ) | |
| STEVEN GREEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Potomac Realty Capital, LLC ("Plaintiff") respectfully submits the following Complaint against Defendant Steven Green ("Green"):

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff is a Delaware limited liability company which was formed under the laws of the State of Delaware and which has its principal place of business in the State of Massachusetts.  Plaintiff is therefore a citizen of the States of Delaware and Massachusetts.  *See* 28 U.S.C. § 1332(c)(1).

2.    Upon information and belief, Green is a citizen of the State of New York as Green is an unmarried man over the age of nineteen years.

3.    The amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

4.    Thus, this Court possesses federal diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5.     Venue is proper in this District because the facts, circumstances, and transactions underlying this action substantially occurred in this District and because real property partly made the subject of this action is located within this District.

6.     In addition, as more fully set forth below, Plaintiff and Green executed a contract containing a forum and venue selection clause designating this District as the proper venue for the adjudication of any dispute between the parties relative to the real property, facts, circumstances, and transactions underlying this action and said contract.

**COUNT ONE**
**(Breach Of Contract—Deficiency)**

7.     Plaintiff adopts and incorporates by reference, as if fully set forth herein, all allegations and averments contained in the preceding numbered and unnumbered paragraphs.

8.     On or about April 21, 2006, Gaslight Commons Apartments Co., LLC ("Gaslight") obtained a loan (the "Loan") from Plaintiff to finance Gaslight's purchase of a residential apartment building located in Montgomery, Alabama within this District (the "Property").

9.     In connection with that transaction, Plaintiff, Gaslight, and Green negotiated, entered into, executed, and delivered to Plaintiff written documents and agreements (the "Loan Documents").

10.     Among the Loan Documents was a Promissory Note (the "Note"), Mortgage, and Indemnity and Guaranty Agreement which Green entered into and executed on or about April 21, 2006 (the "Guaranty").   True, correct, and authentic copies of the Note, Mortgage, and Guaranty are respectively attached as Exhibits "A", "B", and "C" and are incorporated herein by reference.

11.    Pursuant to the Guaranty, Green promised to guaranty the performance of Gaslight under the Note, Mortgage, and other Loan Documents. *See* Exh. A.

12.    In addition, the Guaranty provides that, among other things, in the event of a dispute between Green and Plaintiff concerning the Loan or the Property, that Green "submits to personal jurisdiction in the state where the Property is located" and that "any such action, suit or proceeding may be brought in any state or federal court of competent jurisdiction sitting in the county where the Property is located". *See* Exh. A.

13.    Subsequent to the execution by Plaintiff, Green, and Gaslight of the Loan Documents, Gaslight defaulted on the Loan by, among other things, failing to make the installment payments required by the Loan Documents when the same became due and payable and causing or allowing to be caused significant and substantial physical waste to the Property.

14.    Thereafter, on or about January 3, 2008, Plaintiff lawfully and without objection foreclosed its secured interest in and to the Property evidenced by the properly executed and recorded Mortgage and related security instruments executed by Plaintiff and Gaslight and included among the Loan Documents.

15.    As a direct and proximate consequence of the physical waste to the Property, the value of the Property at the time of the foreclosure had substantially diminished from the Loan amount, resulting in a deficiency balance owed by Green to Plaintiff.

16.    Therefore, Green owes Plaintiff the damages incurred by Plaintiff at the time of foreclosure, and which Plaintiff continues to incur, as set forth below and as provided by the Note, Mortgage, Guaranty and other Loan Documents.

17.    Said damages include a deficiency balance of $3,265,000, accrued and unpaid interest and fees beginning on the date of default through March 31, 2008 in the amount

of $1,143,532.24, future accruals of interest beginning on April 1, 2008 in the amount provided by the Loan Documents, plus reasonable attorney's fees in the amount of 15% of the foregoing total balance and plus costs of court, as called for by the Loan Documents.

18.    Said damages further include costs and fees which Plaintiff incurred after the date of the foreclosure to carry on the operations of the residential apartments at the Property in the amount of $142,126.57.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Green in the amount of $3,265,000, plus accrued and unpaid interest and fees in the amount of $1,143,532,24, plus future accruals of interest beginning on April 1, 2008 in the amount provided by the Loan Documents, plus carry costs in the amount of $142,126.57, plus reasonable attorney's fees in the amount of 15% of the foregoing total balance and plus costs of court, as called for by the Loan Documents, plus post-judgment interest until paid in full.  Plaintiff further demands such additional, appropriate relief to which it may be entitled.

## COUNT TWO
### (Breach Of Contract—Waste and Rents Due)

19.    Plaintiff adopts and incorporates by reference, as if fully set forth herein, all allegations and averments contained in the preceding numbered and unnumbered paragraphs.

20.    In addition to the breaches of the Note, Mortgage, and Guaranty set forth above, Green further breached the Loan Documents without cause or justification by, among other things, failing to ensure against the commission of physical waste in and to the Property and by failing to collect and remit rents for residential apartment units within the Property to Plaintiff as required by the Loan Documents.

21.    Indeed, Green caused or failed to prevent significant waste which substantially damaged the condition and habitability of some or all of the Property prior to Plaintiff's foreclosure.

22.    As a natural, proximate, and direct result of Green's breaches of the Guaranty, Plaintiff has been damaged and continues to incur damages.

23.    Said damages include $288,809.50 of rents and leases which Green failed to collect and remit to Plaintiff when due and owing pursuant to the Loan Documents and $4,606,810.00 in costs which Plaintiff has incurred and continues to incur to restore some or all of the Property to a habitable condition by repairing the significant physical waste which Green caused or permitted to be caused to the Property.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Green in the amount of $4,895,619.50, plus reasonable attorney's fees in the amount of 15% of the foregoing total balance due and plus costs of Court as provided by the Guaranty and Loan Documents, plus post-judgment interest until paid in full.    Plaintiff further demands such additional and appropriate relief to which it may be entitled.

Respectfully submitted,

*Robin Beardsley*

Kerry P. McInerney (ASB 7857-N75K)
Robin L. Beardsley (ASB 7270-I63B)
Attorney for Plaintiff,
Potomac Realty Capital, LLC

OF COUNSEL:

Sirote & Permutt, P.C.
2311 Highland Avenue South
Birmingham, Alabama 35205
(205) 930-5100 (Telephone)
(205) 930-5101 (Facsimile)
kmcinerney@sirote.com
rbeardsley@sirote.com

**PLEASE SERVE THE DEFENDANT**
**BY CERTIFIED MAIL AS FOLLOWS:**

Mr. Steven Green
81 Pondfield Road, Suite 334
Bronxville, New York  10708

# EXHIBIT "A"

Gaslight Commons Apartments
Loan Number: 10084

### PROMISSORY NOTE

$11,000,000.00                                        April 21, 2006

 THIS **PROMISSORY NOTE** (this "**Note**"), is made as of April 21, 2006 by **GASLIGHT COMMONS APARTMENTS CO., LLC**, a Delaware limited liability company ("**Borrower**"), having an address at c/o Green Realty Development Company, LLC, 81 Pondfield Road, Suite 334, Bronxville, New York 10708, to and in favor of **POTOMAC REALTY CAPITAL, LLC**, a Delaware limited liability company ("**Lender**"), having an address at 75 Second Avenue, Suite 605, Needham, Massachusetts, 02494, Attention: Daniel Palmier.

 NOW, THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender, without any counterclaim, setoff or deduction whatsoever, on the Maturity Date (as hereinafter defined), at the office of Lender, or at such other place as Lender may designate to Borrower in writing from time to time, the principal sum of ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00), together with interest on so much thereof as is from time to time outstanding and unpaid, from the date of the advance of the principal evidenced hereby, at the applicable interest rate as hereinafter set forth, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

### ARTICLE I - TERMS AND CONDITIONS

 1.01   Definitions.  The following words and phrases shall have the meaning specified below.

 "**Applicable Interest Rate**" has the meaning set forth in Section 1.02(b).   It is the interest rate from time to time accruing on the Loan.

 "**Debt Service Coverage Ratio**" ("**DSCR**") for the purposes of the Loan Documents, is the ratio of the Security Property's (hereinafter defined) net operating income ("**NOI**") to the "**Debt Service Amount**".  NOI will be an annualized amount calculated by Lender considering the Security Property's gross income in place and for the twelve-month period prior to the calculation, the Property's expenses in place and for the twelve-month period prior to the calculation (as such expenses may be adjusted by Lender for taxes, insurance and other accruals), considering a replacement reserve in an amount of $250 multiplied by the number of residential units at the Property, and assuming a vacancy and collection loss factor of the Security Property's actual vacancy, but not less than 5.0%. The Debt Service Amount is an amount equal to the annualized interest payments that would be due under this Note using the Applicable Interest Rate in effect at the time Debt Service Coverage Ratio is being calculated.

 "**Default Interest Rate**" has the meaning set forth in Section 1.08.

1

"**Exit Fee**" has the meaning set forth in Section 1.05.

"**Interest Rate Adjustment Date**" means the first (1st) day of the calendar month for which the Applicable Interest Rate is determined (i.e., the Interest Rate Adjustment Date is January 1 with respect to the interest due on February 1 for interest accrued during said month of January).

"**Interest Rate Index**" means the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board forty-five (45) days prior to each Interest Rate Adjustment Date.

"**LIBOR Business Day**" means a day upon which United States dollar deposits may be dealt in on the London and the New York City interbank markets and commercial banks and foreign exchange markets are open in London and New York City.

"**LIBOR Rate**" means the average of London Interbank Offered Rates (in U.S. dollar deposits) for a term of one month determined solely by Lender as of each Interest Rate Adjustment Date. On each Interest Rate Adjustment Date, Lender will obtain the close-of-business LIBOR Rate The Wall Street Journal on the last LIBOR Business Day of the month immediately preceding the Interest Rate Adjustment Date. If The Wall Street Journal ceases publication or ceases to publish the LIBOR Rate, Lender shall select a comparable publication to determine the LIBOR Rate and provide notice thereof to Borrower. The LIBOR Rate may or may not be the lowest rate based upon the market for U.S. dollar deposits in the London Interbank Eurodollar Market at which Lender prices loans on the date on which the LIBOR Rate is determined by Lender as set forth above.

"**Loan**" means the loan in the original principal amount of $11,000,000.00 evidenced by this Note.

"**Maturity Date**" means May 1, 2007, subject to the extension of the term of this Note pursuant to the terms, provisions and conditions of Section 1.06 hereof.

"**Payment Date**" has the meaning set forth in Section 1.03(a).

1.02    Calculation of Interest Rate.

(a)    Interest due on the Loan shall be paid in arrears, calculated based on a 360-day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to close of business.

(b)    Interest shall accrue on outstanding principal at the rate ("**Applicable Interest Rate**") which is the LIBOR Rate plus 6.00% percent ("**Margin**"), which combined figure shall be rounded upwards to the nearest one-eighth percent (.125%). Adjustments to the Applicable Interest Rate in connection with changes in the LIBOR Rate shall be made on the

Interest Rate Adjustment Date, except that the initial Applicable Interest Rate shall be determined three (3) business days prior to the Closing Date.

(c)     Lender's obligation to maintain interest based on the LIBOR Rate shall be suspended and the Applicable Interest Rate shall be based on the Interest Rate Index (plus Margin) upon Lender's determination, in good faith, that adequate and reasonable means do not exist for ascertaining the LIBOR Rate or that a contingency has occurred which materially and adversely affects the London Interbank Eurodollar Market at which Lender prices loans (which determination by Lender shall be conclusive and binding on Borrower in the absence of manifest error). Computation of the Applicable Interest Rate based on the Interest Rate Index shall continue until Lender determines that the circumstances giving rise to Lender's substitution of the Interest Rate Index for the LIBOR Rate no longer exist. Lender shall promptly notify Borrower of each such determination.

(d)     If, at any time, Lender determines that it has miscalculated the Applicable Interest Rate (whether because of a miscalculation of the LIBOR Rate or otherwise), Lender shall notify Borrower of the necessary correction. If the corrected Applicable Interest Rate represents an increase in the applicable monthly payment, Borrower shall, within ten (10) days thereafter, pay to Lender the corrected amount. If the corrected Applicable Interest Rate represents an overpayment by Borrower to Lender and no Event of Default then exists, Lender shall refund the overpayment to Borrower or, at Lender's option, credit such amounts against Borrower's payment next due hereunder.

(e)     All payments made by Borrower hereunder shall be made free and clear of, and without reduction for, or on account of, any income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings hereafter imposed, levied, collected, withheld or assessed by any government or taxing authority (other than taxes on the overall net income or overall gross receipts of Lender imposed as a result of a present or former connection between Lender and the jurisdiction of the government or taxing authority imposing same provided, that this exclusion shall not apply to a connection arising solely from Lender's having executed, delivered, performed its obligations under, received a payment under, or enforced this Note or any other Loan Document). If any such amounts are required to be withheld from amounts payable to Lender, the amounts payable to Lender under the Loan Documents shall be increased to the extent necessary to yield to Lender, after payment of such amounts, interest or any such other amounts payable at the rates or in the amounts specified herein. If any such amounts are payable by Borrower, Borrower shall pay all such amounts by their due date and promptly send Lender a certified copy of an original official receipt showing payment thereof. If Borrower fails to pay such amounts when due or to deliver the required receipt to Lender, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failure.

(f)     If Lender determines that the adoption of any law, regulation, rule or guideline (including, without limitation, any change regarding the imposition or increase in reserve requirements), whether or not having the force of law, does or will have the effect of reducing Lender's rate of return on the Loan (other than in connection with ordinary fluctuations in the LIBOR Rate), then, from time to time, within five (5) business days after written demand by Lender, Borrower shall pay Lender such additional amount as will compensate Lender for its

3

reduction. In addition, if any law, regulation, rule or guideline hereafter is enacted or modified, whether or not having the force of law, and compliance therewith results in an increase in the cost to Lender (including, without limitation, a reduction in the income received by Lender) in making, funding or maintaining interest on the Loan at the rate herein provided, then, within five (5) business days after written demand by Lender, Borrower shall pay Lender the additional amounts necessary to compensate Lender for such increased costs.

(g)    Notwithstanding anything to the contrary contained herein, if Borrower is prohibited by law from paying any amount due to Lender under Section 1.02(e) or (f), Lender may elect to declare the unpaid principal balance of the Loan, together with all unpaid interest accrued thereon and any other amounts due hereunder, due and payable within ninety (90) days of Lender's written notice to Borrower. Lender's delay or failure in accelerating the Loan upon the discovery or occurrence of an event under Section 1.02(e) or (f) shall not be deemed a waiver or estoppel against the exercise of such right.

1.03    Payments.

(a)    Borrower shall pay all accrued interest on the unpaid principal amount hereof from the date thereof until the principal amount shall be paid in full at the Applicable Interest Rate. Such interest shall be payable in arrears in monthly installments, beginning on June 1, 2006, and continuing on the first (1st) day of each and every month (each, a "**Payment Date**") thereafter with respect to the interest accrued hereunder during the immediately preceding calendar month through and including the Maturity Date, at which time the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, shall be due and payable in full.

(b)    Payments in federal funds immediately available in the place designated for payment received by Lender prior to 2:00 p.m. local time at said place of payment shall be credited prior to close of business, while other payments may, at the option of Lender, not be credited until immediately available to Lender in federal funds in the place designated for payment prior to 2:00 p.m. local time at said place of payment on a day on which Lender is open for business.

(c)    All payments shall be applied first, to all Late Charges, Default Rate interest or other premiums and other sums payable hereunder or under the other Loan Documents; second, to all interest (other than Default Rate interest) that shall be due and payable with respect to the Loan pursuant to the terms hereof as of the date the payment is received; and third, taking into account the respective date of such payments, to the outstanding principal amount of the Loan until the Loan has been repaid.

1.04    Prepayment.

(a)    Borrower may prepay the Loan in whole only, on any Payment Date in accordance with the following provisions:

(1)    Lender shall have received from Borrower thirty (30) days' prior written notice specifying the date proposed for prepayment;

4

(2)     Borrower shall pay to Lender all interest due through and including the relevant Payment Date on which the prepayment is being made, together with any and all other amounts due and owing pursuant to the terms of this Note or the other Loan Documents, including, without limitation, the Exit Fee and any Late Charges;

(3)     No Event of Default shall have occurred and be continuing; and

(4)     If prepayment is not made on a Payment Date, Borrower pays with such prepayment (in addition to all other amounts due under this Section 1.04) an amount equal to the unearned interest which would accrue for the period from the date of prepayment through the forthcoming Payment Date.

(b)     Partial prepayments of this Note shall not be permitted, except partial prepayments resulting from Lender applying insurance or condemnation proceeds to reduce the outstanding principal balance of this Note as provided in the Security Instrument (as defined in Section 1.07 below), in which event no prepayment fee or premium shall be due other than the Exit Fee. No notice of prepayment shall be required under the circumstance specified in the preceding sentence. No principal amount repaid may be reborrowed. Partial payments of principal shall be applied to the unpaid principal balance evidenced hereby on the next succeeding Payment Date following Lender's determination to apply insurance or condemnation proceeds to the partial prepayment of the outstanding principal balance of this Note.

1.05     Exit Fee.  Any payment of principal hereunder (whether on the Maturity Date or the date the unpaid principal balance otherwise becomes due, by acceleration or otherwise or upon prepayment), shall be accompanied by payment of an amount (the "Exit Fee") equal to one percent (1.00%) of the principal being paid. Borrower acknowledges that the Exit Fee has been earned by Lender upon the closing of the Loan. Failure to pay the Exit Fee shall constitute an Event of Default hereunder. Notwithstanding the foregoing provisions of this Section 1.05, the Exit Fee shall be waived in the event that (i) Borrower refinances the Loan with a permanent loan provided by Lender or (ii) Borrower sells the Property to a third party purchaser and such third party purchaser obtains financing for the Property from Lender.

1.06     Extension of Maturity Date.  Borrower may extend the Maturity Date for one (1) additional twelve (12) month period provided all of the following terms and conditions are satisfied:

(a)     At least thirty (30) days prior to the expiration of the Maturity Date, Borrower delivers to Lender notice of Borrower's election to extend the Maturity Date for such twelve (12) month period;

(b)     Borrower shall pay all of Lender's reasonable expenses, if any, incurred in connection with the exercise by Borrower of its option to extend the Maturity Date;

(c)     No Event of Default exists; and

(d)     Borrower shall pay to Lender an extension fee equal to one percent (1.00%) of the original principal balance of this Note at the time such extension is exercised by

5

Borrower, which payment must be made with the notice delivered to Lender pursuant to Section 1.06(a) above.

    1.07   Security.  The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, (a) that certain Mortgage and Security Agreement dated as of the date hereof (the **"Security Instrument"**), from Borrower to Lender, encumbering certain property located in the County of Montgomery, State of Alabama, and (b) an Assignment of Leases and Rents dated as of the date hereof, made by Borrower in favor of Lender (the "Assignment").  The Security Instrument and the Assignment, together with this Note, any indemnity and guaranty agreement, any hazardous substances indemnity agreement, and such other agreements, documents and instruments executed in connection therewith, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions and modifications thereof, are herein referred to collectively as the **"Loan Documents"**.  All of the terms and provisions of the other Loan Documents are incorporated herein by reference.  Some of the other Loan Documents are to be filed for record on or about the date hereof in the appropriate public records.

    1.08   Default.  It is hereby expressly agreed that if any sum payable under this Note is not paid upon the Maturity Date or within five (5) days after the date on which it is due and payable hereunder, or should any other default occur under any of the Loan Documents which is not cured within any applicable grace or cure period, including, without limitation, any sale, transfer, conveyance or other violation of the terms of Section 1.13 of the Security Instrument, then a default shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of Lender and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.  In the event that any payment is not received by Lender (subject to any applicable grace period) upon the Maturity Date or with respect to any other payment, within five (5) days after the date on which it is due and payable hereunder, then in addition to any default interest payments due hereunder, Borrower shall also pay to Lender a late charge ("**Late Charge**") in an amount equal to four percent (4.0%) of the amount of such overdue payment.  At anytime that an Event of Default exists under the Security Instrument, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note at a rate per annum equal to five percent (5.0%) plus the interest rate which would be in effect hereunder absent such default or maturity, or if such increased rate of interest may not be collected under applicable law, then at the maximum rate of interest, if any, which may be collected from Borrower under applicable law (the "**Default Interest Rate**"), and such default interest shall be immediately due and payable.  Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty.  The remedies of Lender in this Note or in the other Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion.  Time is of the essence of this Note.  In the event this Note, or any part hereof, is collected by or through an attorney-at-

law, Borrower agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees.

1.09    Exculpation.  Notwithstanding anything in the Loan Documents to the contrary, but subject to the qualifications hereinbelow set forth, Lender agrees that (i) Borrower shall be liable upon the indebtedness evidenced hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security therefor, the same being all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents (collectively, the **"Security Property"**), (ii) if default occurs in the timely and proper payment of all or any part of such indebtedness evidenced hereby or in the timely and proper performance of the other obligations of Borrower under the Loan Documents, any judicial proceedings brought by Lender against Borrower shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, and confirmation of any sale under power of sale, and no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Borrower or its partners or members other than the Security Property except with respect to the liability described below in this Section, and (iii) in the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, whether by judicial proceedings or exercise of power of sale, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Lender against Borrower, except with respect to the liability described below in this Section; provided, however, that, notwithstanding the foregoing provisions of this Section, Borrower shall be fully and personally liable and subject to legal action for (a) fraud or material misrepresentation or failure to disclose a material fact by Borrower, any of Borrower's officers, agents, principals, general partners, managing members or employees, or any guarantor or indemnitor in connection with the Loan (as defined in the Security Instrument), the origination of the Loan and the performance of Borrower's obligations under the Loan Documents; (b) the gross negligence or willful misconduct of Borrower; (c) physical waste of the Security Property; (d) the removal or disposal of any portion of the Security Property after an Event of Default (as defined in the Security Instrument) which are not immediately replaced with items of like kind value and use; (e) the misapplication or misappropriation by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Security Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Security Property, (C) any Rents (as defined in the Security Instrument) following an Event of Default, or (D) any Rents paid more than one month in advance; (f) the failure to pay (A) taxes and assessments affecting the Security Property, except when the gross revenue generated from the Security Property is insufficient to pay for same, or (B) charges for labor or materials or other charges that create liens on any portion of the Security Property (other than Taxes); (g) any and all tenant security deposits held by Borrower not being properly applied or returned to tenants when due or delivered to Lender; (i) the failure to obtain and maintain the fully paid for insurance in accordance with Section 1.4 of the Security Instrument; and (h) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions of Section 1.32 of the Security Instrument (except with respect to the terms and provisions of clauses (f) and (l) thereof).  Nothing contained in this Section shall (1) be deemed

7

to be a release or impairment of the indebtedness evidenced by this Note or the other obligations of Borrower under the Loan Documents or the lien of the Loan Documents upon the Security Property, or (2) preclude Lender from foreclosing the Loan Documents in case of any default or from enforcing any of the other rights of Lender except as stated in this Section, or (3) limit or impair in any way whatsoever the Indemnity and Guaranty Agreement or the Hazardous Substances Indemnity Agreement, each dated of even date herewith, executed and delivered in connection with the indebtedness evidenced by this Note, or release, relieve, reduce, waive or impair in any way whatsoever, any obligation of any party to such Indemnity and Guaranty Agreement or Hazardous Substances Indemnity Agreement.

Notwithstanding anything to the contrary in this Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with the Loan Documents, and (B) such indebtedness shall be fully recourse to Lender in the event that: (i) the first full monthly payment of principal and interest under this Note is not paid when due; (ii) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary monetary lien encumbering the Security Property; (iii) there is a breach of Section 1.13 of the Security Instrument, (iv) a receiver, liquidator or trustee of Borrower or of any guarantor shall be appointed or if Borrower or any guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or any guarantor or if any proceeding for the dissolution or liquidation of Borrower or of any guarantor shall be instituted by Borrower or any guarantor, or (v) Borrower or any guarantor (or any person comprising such guarantor) or any party holding any direct or indirect interest in Borrower shall, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with this Note, the Security Instrument or any of the other Loan Documents, asserts a defense, seeks judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan which the court (or appellate court, if applicable) in such action or proceeding determines is without merit (in respect of a defense) or unwarranted (in respect of a request for judicial intervention or injunctive or other equitable relief).

1.10    Refinance Loan.

(a)    Borrower acknowledges that as an inducement to make the Loan, Lender shall have the exclusive right (but not the obligation) to provide directly to Borrower refinancing with respect to the Property in order to refinance the Loan (the "**Refinance Loan**") on customary terms and conditions then offered by institutional lender with respect to similar properties.

(b)    In the event Borrower is seeking to refinance the Loan, at least three months prior to the Maturity Date (or, if Borrower intends to prepay the Debt pursuant to Section 1.04 hereof, at least three months prior to the date of such prepayment), Borrower shall submit an application for such Refinance Loan to Lender. Borrower shall provide such information as is

reasonably requested by Lender in connection therewith and shall cooperate in good faith with Lender.

(c)    Before accepting any other offer of or commitment for financing, Borrower shall submit such commitment or other form of written offer to provide such financing to Lender to permit Lender to match such commitment or other written offer. Lender will have ten (10) business days after submission of such commitment or written offer to it to match the terms thereof. If Lender matches such terms, Borrower will enter into such financing arrangement with Lender upon the terms matched by Lender. If Lender does not match such terms within such ten (10) business day period, Borrower may enter into the financing arrangement with the other institutional lender pursuant to the terms of the commitment or other written offer. Notwithstanding the foregoing provisions, if, after Borrower has accepted any such commitment or other form of offer from an institutional lender other than Lender, any of the material terms thereof are modified so as to increase the yield to such lender, reduce the amount of the loan or reduce the term thereof, then Lender will be given a further opportunity to match such new terms and Borrower will present such new terms to Lender which will then have ten (10) business days after receipt thereof to match the new terms. If Lender agrees within such ten (10) business day period to match such new terms, Borrower will consummate the financing with Lender. If Lender does not match such new terms within such ten (10) business day period, Borrower may enter into such financing arrangement upon such new terms with the other institutional lender. For the purposes of this Section, the terms "match" or "matching" means agreeing to match the principal amount, overall yield to the lender, and term of the loan.

(d)    If Lender provides (or arranges with a third party lender to provide) to Borrower a financing commitment letter for the Refinance Loan or matches a commitment or offer from another institutional lender pursuant to Section 1.10(c), Borrower shall be obligated to accept such financing commitment from Lender for the Refinance Loan.

## ARTICLE II- GENERAL CONDITIONS

2.01    <u>No Waiver; Amendment</u>. No failure to accelerate the debt evidenced hereby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

9

    2.02   <u>Waivers</u>.  Presentment for payment, demand, protest and notice of demand, protest and nonpayment and all other notices are hereby waived by Borrower.  Borrower hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

    2.03   <u>Limit of Validity</u>.  The provisions of this Note and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid ("Interest"), to Lender for the use, forbearance or retention of the money loaned under this Note exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under this Note in the inverse order of its maturity (whether or not then due) or at the option of Lender be paid over to Borrower, and not to the payment of Interest.  All Interest (including any amounts or payments deemed to be Interest), contracted for, charged, taken, reserved,  paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note, including any extensions or renewals hereof, until payment in full of the principal balance of this Note so that the Interest thereof for such full period will not exceed the maximum amount permitted by applicable law.  This Section 2.03 will control all agreements between Borrower and Lender.

    2.04   <u>Use of Funds</u>.  Borrower hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal, family or household purposes.

    2.05   <u>Unconditional Payment</u>.  Borrower is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.  In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.06   Further Assurances.   Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all reasonable documents, and take all reasonable actions, reasonably required by Lender from time to time to confirm the rights created under this Note and the other Loan Documents, to protect and further the validity, priority and enforceability of this Note and the other Loan Documents, to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents, or otherwise carry out the purposes of the Loan Documents and the transactions contemplated thereunder; provided, however, that no such further actions, assurances and confirmations shall increase, modify or change Borrower's obligations under this Note or under the other Loan Documents.

2.07   Submission to Jurisdiction; Waiver of Jury Trial.

(1)   BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (A) SUBMITS TO PERSONAL JURISDICTION IN THE STATE WHERE THE SECURITY PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE, (B) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN EITHER THE CITY OR THE COUNTY WHERE THE SECURITY PROPERTY IS LOCATED, (C) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (D) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT BORROWER WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM AND BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED ON THE FIRST PAGE HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(2)   BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

2.08    Miscellaneous.

(a)    THIS NOTE SHALL BE INTERPRETED, CONSTRUED AND ENFORCED ACCORDING TO THE LAWS OF THE STATE OF ALABAMA. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.    As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.  Subject to the limitations set forth in Section 1.05 above, if Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.  Capitalized terms used in this Note and not otherwise defined herein shall have the meaning ascribed to them in the Security Instrument or in the other Loan Documents.  Time is of the essence with respect to all provisions of this Note, the Security Instrument and the other Loan Documents.  This Note and the other Loan Documents contain the entire agreements between the parties hereto relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Security Instrument. If any provision under this Note or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Note and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Promissory Note as of the day and year first written above.

**BORROWER:**

**GASLIGHT COMMONS APARTMENTS CO.,**
LLC, a Delaware limited liability company

By: _____
      Name:  Steven Green
      Title:   Sole Member

13
[Promissory Note]

# EXHIBIT "B"

Prepared by, and after recording return to:

Bernice H. Cilley, Esquire
Troutman Sanders LLP
P. O. Box 1122
Richmond, Virginia 23218-1122

Loan Number:  10084
Gaslight Commons Apartments

## GASLIGHT COMMONS APARTMENTS CO., LLC
(Mortgagor)

to

## POTOMAC REALTY CAPITAL, LLC
(Mortgagee)

## MORTGAGE AND SECURITY AGREEMENT

Dated:  As of April 21, 2006

I certify this to be a true and exact copy of the original.

By:

## Table of Contents

Page

ARTICLE I.    COVENANTS OF BORROWER ..............................................5
1.1    Warranties of Borrower ........................................................5
1.2    Defense of Title ................................................................10
1.3    Performance of Obligations ................................................10
1.4    Insurance. ......................................................................10
1.5    Payment of Taxes ............................................................13
1.6    Tax and Insurance Impound Account ..................................14
1.7    Reserves ........................................................................15
1.8    Security Interest In Reserves. ............................................18
1.9    Casualty and Condemnation. ............................................19
1.10   Mechanics' Liens .............................................................22
1.11   Assignment of Leases and Rents ........................................22
1.12   Leases and Licenses. ........................................................23
1.13   Alienation and Further Encumbrances..................................24
1.14   Payment of Utilities, Assessments, Charges, Etc ...................26
1.15   Access Privileges and Inspections .......................................26
1.16   Waste; Alteration of the Property .......................................26
1.17   Zoning; Use....................................................................26
1.18   Financial Statements and Books and Records ........................27
1.19   Further Documentation .....................................................28
1.20   Payment of Costs; Advances to Protect Property. ..................28
1.21   Security Interest ..............................................................29
1.22   Security Agreement ..........................................................30
1.23   Easements and Rights-of-Way ...........................................31
1.24   Compliance with Laws. .....................................................31
1.25   Additional Taxes..............................................................32
1.26   Borrower's Waivers .........................................................32
1.27   SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL. ..............33
1.28   Contractual Statute of Limitations ......................................34
1.29   Management....................................................................34
1.30   Hazardous Materials and Environmental Concerns..................35
1.31   INDEMNIFICATION; SUBROGATION. ...................................39
1.32   Covenants with Respect to Indebtedness; Operations and Fundamental
Changes of Borrower ...............................................................40
1.33   Litigation.......................................................................42
1.34   ERISA. ..........................................................................42
ARTICLE II.    EVENTS OF DEFAULT ...................................................43
2.1    Events of Default .............................................................43
ARTICLE III.   REMEDIES.................................................................45
3.1    Remedies Available ..........................................................45
3.2    Application of Proceeds .....................................................47
3.3    Right and Authority of Receiver or Lender in the Event of Default; Power of
Attorney...............................................................................48

i

Table of Contents
(continued)

Page

3.4    Occupancy After Foreclosure ...................................................49
3.5    Notice to Account Debtors.........................................................49
3.6    Cumulative Remedies ...............................................................49
3.7    Payment of Expenses ................................................................50
ARTICLE IV.    MISCELLANEOUS TERMS AND CONDITIONS.......................50
4.1    Time of Essence........................................................................50
4.2    Release of Security Instrument .................................................50
4.3    Action by Lender ......................................................................50
4.4    Notices .....................................................................................50
4.5    Successors and Assigns.............................................................51
4.6    Severability ..............................................................................52
4.7    Gender......................................................................................52
4.8    Waiver; Discontinuance of Proceedings ...................................52
4.9    Section Headings ......................................................................52
4.10   GOVERNING LAW...................................................................52
4.11   Counting of Days .....................................................................52
4.12   Application of the Proceeds of the Note ...................................52
4.13   Unsecured Portion of Indebtedness ..........................................53
4.14   Cross Default ...........................................................................53
4.15   Interest After Sale ....................................................................53
4.16   Construction of this Document .................................................53
4.17   No Merger ................................................................................53
4.18   Rights With Respect to Junior Encumbrances...........................53
4.19   Lender May File Proofs of Claim .............................................53
4.20   After-Acquired Property ...........................................................53
4.21   No Representation......................................................................54
4.22   Counterparts.............................................................................54
4.23   Personal Liability......................................................................54
4.24   Recording and Filing.................................................................54
4.25   Entire Agreement and Modifications.........................................54
4.26   Maximum Interest.....................................................................54
4.27   Application of Default Interest Rate Not a Waiver ...................55
4.28   Interest Payable by Lender........................................................55
4.29   Further Stipulations...................................................................55
4.30   Relationship of the Parties ........................................................55
4.31   Fixture Filing ...........................................................................55
4.32   Cooperation With Rating Agencies and Investors .....................55
4.33   State Specific Provisions ..........................................................55

## MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (this "**Security Instrument**") is made as of April 21, 2006, from by GASLIGHT COMMONS APARTMENTS CO., LLC, a Delaware limited liability company ("**Borrower**"), having an address at c/o Green Realty Development Company, LLC, 81 Pondfield Road, Suite 334, Bronxville, New York 10708 and **POTOMAC REALTY CAPITAL, LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**"), whose address is 75 Second Avenue, Suite 605, Needham, Massachusetts 02494, Attention: Daniel Palmier.

### W I T N E S S E T H :

THAT FOR AND IN CONSIDERATION OF THE SUM OF TEN AND NO/100 DOLLARS ($10.00), AND OTHER VALUABLE CONSIDERATION, INCLUDING THE INDEBTEDNESS HEREIN RECITED, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, BORROWER HEREBY IRREVOCABLY MORTGAGES, GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, PLEDGES, SETS OVER AND ASSIGNS, AND GRANTS A SECURITY INTEREST, TO AND IN FAVOR OF LENDER, ITS SUCCESSORS AND ASSIGNS, with power of sale, in all of Borrower's estate, right, title and interest in, to and under any and all of the following described property, whether now owned or hereafter acquired (collectively, the "**Property**"):

(A)    All that certain real property situated in the County of Montgomery, State of Alabama, more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "**Real Estate**"), together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining thereto, and all of the estate, right, title, interest, claim and demand whatsoever of Borrower therein or thereto, either at law or in equity, in possession or in expectancy, now owned or hereafter acquired;

(B)    All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Real Estate (the "**Improvements**");

(C)    All easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, air rights and development rights and other emblements now or hereafter located on the Real Estate or under or above the same or any part or parcel thereof, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Property or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower;

(D)    All furniture, furnishings, fixtures, goods, equipment, inventory or personal property owned by Borrower and now or hereafter located on, attached to or used in or about the Improvements, including, but not limited to, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposal

and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property owned by Borrower as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein, and all building materials and equipment hereafter situated on or about the Real Estate or the Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

(E)    All water, water courses, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights and powers which are appurtenant to, located on, under or above or used in connection with the Real Estate or the Improvements, or any part thereof, together (i) with all utilities, utility lines, utility commitments, utility capacity, capital recovery charges, impact fees and other fees paid in connection with the same, (ii) reimbursements or other rights pertaining to utility or utility services provided to the Real Estate and/or the Improvements, and (iii) the present or future use or availability of waste water capacity or other utility facilities to the extent same pertain to or benefit the Real Estate and/or the Improvements, including, without limitation, all reservations of or commitments or letters covering any such use in the future, whether now existing or hereafter created or acquired;

(F)    All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Real Estate;

(G)    All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Lender pursuant to this Security Instrument or any other of the Loan Documents (as hereinafter defined), including, without limitation, all funds now or hereafter on deposit in the Reserves (as hereinafter defined);

(H)    All leases, licenses, tenancies, concessions and occupancy agreements of the Real Estate or the Improvements now or hereafter entered into (collectively, the "Leases") and all rents, royalties, issues, profits, revenue, income and other benefits (collectively, the "Rents" or "Rents and Profits") of the Real Estate, the Improvements, or the fixtures or equipment, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future lease (including, without limitation, oil, gas and mineral leases), license, tenancy, concession, occupancy agreement or other agreement pertaining thereto or arising from any of the Contracts (as hereinafter defined) or any of the General Intangibles (as hereinafter defined) and all cash or securities (the "Security Deposits") deposited in the security deposit account (the "Security Deposit Account") to secure performance by the tenants, lessees or licensees, as applicable, of their obligations under any of the Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms, subject, however, to the provisions contained in Section 1.11 of this Security Instrument;

(I)    All contracts and agreements now or hereafter entered into covering any part of the Real Estate or the Improvements (collectively, the "Contracts") and all revenue, income and other benefits thereof, including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Real Estate or the Improvements (including

2

plans, specifications, studies, drawings, surveys, tests, operating and other reports, bonds and governmental approvals) or to the management or operation of any part of the Real Estate or the Improvements;

(J)    All present and future monetary deposits given to any public or private utility with respect to utility services furnished to any part of the Real Estate or the Improvements;

(K)    All present and future funds, accounts, instruments, accounts receivable, documents, causes of action, claims, general intangibles (including, without limitation, trademarks, trade names, servicemarks and symbols now or hereafter used in connection with any part of the Real Estate or the Improvements, all names by which the Real Estate or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Borrower has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Real Estate or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Real Estate or the Improvements (collectively, the "**General Intangibles**");

(L)    All water taps, sewer taps, certificates of occupancy, permits, special permits, uses, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Real Estate or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnishings, personal property or components of any of the foregoing now or hereafter located or installed on the Real Estate or the Improvements;

(M)    All building materials, supplies and equipment now or hereafter placed on the Real Estate or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Real Estate or the Improvements;

(N)    All right, title and interest of Borrower in any insurance policies or binders now or hereafter relating to the Property, including any unearned premiums thereon;

(O)    All proceeds, products, substitutions and accessions (including claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards; and

(P)    All other or greater rights and interests of every nature in the Real Estate or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower.

FOR THE PURPOSE OF SECURING:

(1)    The debt evidenced by that certain Promissory Note (such Promissory Note, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements and extensions thereof, is hereinafter referred to as the "**Note**") of even date with this Security Instrument, made by Borrower and payable to the order of Lender in

the original principal amount of Eleven Million and 00/100 Dollars ($11,000,000.00) (the "Loan" or the "Loan Amount"), together with interest and any fees as therein provided;

(2)     The full and prompt payment and performance of all of the provisions, agreements, covenants and obligations herein contained and contained in any other agreements, documents or instruments now or hereafter evidencing, securing or otherwise relating to the indebtedness evidenced by the Note (the Note, this Security Instrument, the Assignment (as hereinafter defined), and such other agreements, documents and instruments, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions and modifications thereof, are hereinafter collectively referred to as the "Loan Documents") and the payment of all other sums therein covenanted to be paid, including, without limitation, any applicable yield maintenance premiums or prepayment fees;

(3)     Any and all future or additional advances (whether or not obligatory) made by Lender to protect or preserve the Property, or the lien or security interest created hereby on the Property, or for taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Borrower's obligations hereunder or under the other Loan Documents or for any other purpose provided herein or in the other Loan Documents (whether or not the original Borrower remains the owner of the Property at the time of such advances), together with interest thereon at the Default Interest Rate (as defined in the Note); and

(4)     Any and all other indebtedness now owing or which may hereafter be owing by Borrower to Lender, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements and extensions thereof.

TO HAVE AND TO HOLD the Property unto Lender, its successors and assigns forever, for the purposes and uses herein set forth.

(All of the sums referred to in Paragraphs (1) through (4) above are herein sometimes referred to as the "secured indebtedness" or the "indebtedness secured hereby").

PROVIDED, HOWEVER, that if the principal and interest and all other sums due or to become due under the Note, including, without limitation, any prepayment fees required pursuant to the terms of the Note, shall have been paid at the time and in the manner stipulated therein and all other sums payable hereunder and all other indebtedness secured hereby shall have been paid and all other covenants contained in the Loan Documents shall have been performed, then, in such case, this Security Instrument shall be satisfied and the estate, right, title and interest of Lender in the Property shall cease, and upon payment to Lender of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs if allowed by law, Lender shall release this Security Instrument and the lien hereof by proper instrument and shall deliver the Note to Borrower. Borrower shall pay Lender's reasonable costs incurred in releasing this Security Instrument.

4

## ARTICLE I.

## COVENANTS OF BORROWER

For the purpose of further securing the indebtedness secured hereby and for the protection of the security of this Security Instrument, for so long as the indebtedness secured hereby or any part thereof remains unpaid, Borrower represents, covenants and agrees as follows:

1.1    Warranties of Borrower.  Borrower, for itself and its successors and assigns, does hereby represent, warrant and covenant to and with Lender, its successors and assigns, that:

(a)    Borrower has good, marketable and indefeasible fee simple title to the Property, subject only to those matters expressly set forth on Schedule B of the title insurance policy obtained by Lender insuring the lien of this Security Instrument (the "**Permitted Exceptions**"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and encumber its interest in the Property in the manner and form hereby done or intended.  None of the Permitted Exceptions materially interfere with the security intended to be provided by this Security Instrument, the current primary use of the Property or the current ability of the Property to generate income sufficient to service the Loan.  Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Lender against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions.  The foregoing warranty of title shall survive the foreclosure, exercise of any power of sale or other enforcement of this Security Instrument and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Property pursuant to any foreclosure, exercise of any power of sale or otherwise;

(b)    No bankruptcy or insolvency proceedings are pending or contemplated by Borrower or, to the best knowledge of Borrower, against Borrower or by or against any endorser, cosigner or guarantor of the Note;

(c)    All reports, certificates, affidavits, statements and other data furnished by Borrower to Lender in connection with the Loan evidenced by the Note are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not misleading;

(d)    The execution, delivery and performance of this Security Instrument, the Note and all of the other Loan Documents have been duly authorized by all necessary action to be taken, and are binding and enforceable against Borrower in accordance with the respective terms thereof, and do not contravene, result in a breach of or constitute (upon the giving of notice or the passage of time or both) a default under the organizational documents of Borrower, or any contract or agreement of any nature to which Borrower is a party or by which Borrower or any of its property may be bound, and do not violate or contravene any law, order, decree, rule or regulation to which Borrower is subject;

5

(e)  Borrower is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any governmental authority or agency in connection with or as a condition to the execution, delivery or performance of this Security Instrument, the Note or the other Loan Documents which has not been so obtained or filed;

(f)  Borrower has obtained or made all necessary (i) consents, approvals and authorizations and registrations and filings of or with all governmental authorities or agencies and (ii) consents, approvals, waivers and notifications of partners, stockholders, members, creditors, lessors and other non-governmental persons and/or entities, in each case, which are required to be obtained or made by Borrower in connection with the execution and delivery of, and the performance by Borrower of its obligations under, the Loan Documents;

(g)  Borrower is not an "investment company", or a company "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended;

(h)  No part of the proceeds of the indebtedness secured hereby will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purpose prohibited by legal requirements or by the terms and conditions of the Loan Documents;

(i)  Borrower and, if Borrower is a partnership, any general partner of Borrower, has filed all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments, including sales and payroll taxes, payable by Borrower and its general partners, if any. Borrower and its general partners, if any, believe that their respective tax returns properly reflect the income and taxes of Borrower and said general partners, if any, for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit;

(j)  Borrower is not an "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA and the assets of Borrower do not constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101;

(k)  The Real Estate and the Improvements and the intended use thereof by Mortgagor comply with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property. The Real Estate and the Improvements constitute a separate tax parcel for purposes of ad valorem taxation. The Real Estate and the Improvements do not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements;

6

(l)    All utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Real Estate and the Improvements for their intended purposes are available to the Property, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities, through public rights-of-way or perpetual private easements reflected in the title insurance policy insuring the lien of this Security Instrument and approved by Lender (the "Title Insurance Policy");

(m)    All streets, roads, highways, bridges and waterways necessary for access to and full use, occupancy, operation and disposition of the Real Estate and the Improvements have been completed, have been dedicated to and accepted by the appropriate municipal authority and are open and available to the Real Estate and the Improvements without further condition or cost to Borrower;

(n)    All curb cuts, driveways and traffic signals shown on the survey delivered to Lender prior to the execution and delivery of this Security Instrument are existing and have been fully approved by the appropriate governmental authority;

(o)    There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or threatened against or affecting Borrower (and, if Borrower is a partnership, any of its general partners, or if Borrower is a limited liability company, any member of Borrower) or the Property which, if adversely determined, would have a material adverse effect on (i) the Property, (ii) the business, prospects, profits, operations or condition (financial or otherwise) of Borrower, (iii) the enforceability, validity, perfection or priority of the lien of any Loan Document, or (iv) the ability of Borrower to perform any obligations under any Loan Document (collectively, a "Material Adverse Effect");

(p)    As of the date of this Security Instrument, (i) the Property is free from delinquent water charges, sewer rents, taxes and assessments, and from unrepaired damage caused by fire, flood, accident or other casualty, and (ii) no part of the Real Estate or the Improvements has been taken in condemnation, eminent domain or like proceeding nor is any such proceeding pending or, to Borrower's knowledge and belief, threatened or contemplated;

(q)    Borrower possesses all franchises, patents, copyrights, trademarks, trade names, licenses and permits adequate for the conduct of its business substantially as now conducted;

(r)    Except as set forth in the Title Insurance Policy insuring the lien of this Security Instrument, no improvements on adjoining properties encroach upon the Property. Except for certain repair items which have been identified and for which funds are being held in escrow pursuant to Section 1.7(b), the Improvements are structurally sound, in good repair and free of defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the Improvements, including, without limitation, the heating and air conditioning systems and the electrical and plumbing systems, are in good working order and condition;

7

(s)    There are no security agreements or financing statements affecting any of the Property other than the security agreements and financing statements created in favor of Lender;

(t)    Borrower has delivered a true, correct and complete schedule of all Leases affecting the Property as of the date hereof, which accurately and completely sets forth in all material respects for each such Lease, the following: (i) the name of the tenant, (ii) the lease expiration date, (iii) extension and renewal provisions, (iv) the base rent payable, and (v) the Security Deposit held thereunder. All Security Deposits with respect to the Property on the date hereof have been transferred to the Security Deposit Account on the date hereof and Borrower is in compliance with all legal requirements relating to such Security Deposits;

(u)    No tenant under any Lease has, as of the date hereof, paid rent more than thirty (30) days in advance, and the rents under such Leases have not been waived, released, or otherwise discharged or compromised;

(v)    The Property is free and clear of any mechanics' or materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law would give rise to any such liens, any of which liens are or may be prior to, or equal with, the lien of this Security Instrument, except those which are insured against by the Title Insurance Policy;

(w)    No Lease or Contract or easement, right-of-way, permit or declaration (collectively, "**Property Agreements**") provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of this Security Instrument;

(x)    Borrower has delivered to Lender true, correct and complete copies of all Property Agreements and no default exists or would exist, with the passing of time or the giving of notice, or both, under any Property Agreement which would, in the aggregate, have a Material Adverse Effect;

(y)    To the best knowledge of Borrower, no offset or any right of offset exists respecting continued contributions to be made by any party to any Property Agreement except as expressly set forth herein. Except as previously disclosed to Lender in writing, no material exclusions or restrictions on the utilization, leasing or improvement of the Property (including non-compete agreements) exist in any Property Agreement;

(z)    All work, if any, to be performed by Borrower under each of the Property Agreements has been substantially performed, all contributions to be made by Borrower to any party to such Property Agreements have been made, and all other conditions to such party's obligations thereunder have been satisfied;

(aa)    The Property is taxed separately without regard to any other real estate and constitutes a legally subdivided lot under all applicable legal requirements (or, if not subdivided, no subdivision or platting of the Property is required under applicable legal requirements), and for all purposes may be mortgaged, conveyed, pledged, hypothecated, assigned or otherwise dealt with as an independent parcel;

(bb)    The Property forms no part of any property owned, used or claimed by Borrower as a residence or business homestead and is not exempt from forced sale under the laws of the State in which the Property is located. Borrower hereby disclaims and renounces each and every claim to all or any portion of the Property as a homestead. The Loan evidenced by the Loan Documents is made and transacted solely for business, investment, commercial or other similar purposes;

(cc)    There are no outstanding options or rights of first offer or refusal to purchase all or any portion of the Property or Borrower's interest therein or ownership thereof;

(dd)    There are no actions, suits, proceedings or orders of record or of which Borrower has notice, and, to the best of Borrower's knowledge, there are no inquiries or investigations, pending or threatened, in any such case against, involving or affecting the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, alleging the violation of any federal, state or local law, statute, ordinance, rule or regulation relating to Environmental Laws (as hereinafter defined). Furthermore, Borrower has not received any written claim, notice or opinion that the ownership or operation of the Property violates any federal, state or local law, statute, ordinance, rule, regulation, decree, order, and/or permit relating to Environmental Laws, and, to the best of Borrower's knowledge, no valid basis for any proceeding, action or claim of such nature exists;

(ee)    Each Lease constitutes the legal, valid and binding obligation of Borrower and, to the best of Borrower's knowledge and belief, is enforceable against the tenant thereof;

(ff)    All work to be performed by Borrower under the Leases has been substantially performed, all contributions to be made by Borrower to the tenants thereunder have been made and all other conditions precedent to each such tenant's obligations thereunder have been satisfied;

(gg)    Each tenant under a Lease has entered into occupancy of the demised premises;

(hh)    To the best of Borrower's knowledge and belief, each tenant is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors;

(ii)    Except as previously disclosed in writing to Lender, there are no brokerage fees or commissions payable to Borrower with respect to the leasing of the space at the Property; and

(jj)    The representations and warranties contained in this Security Instrument, or the review and inquiry made on behalf of Borrower therefor, have all been made by persons having the requisite expertise and knowledge to provide such representations and warranties. No statement or fact made by or on behalf of Borrower in this Security Instrument or in any certificate, document or schedule furnished to Lender pursuant hereto, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements

9

contained therein or herein not misleading (which may be to Borrower's best knowledge where so provided herein). There is no fact presently known to Borrower which has not been disclosed to Lender and which would have a Material Adverse Effect.

1.2    <u>Defense of Title</u>. If, while this Security Instrument is in force, the title to the Property or the interest of Lender therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached directly or indirectly, or endangered, clouded or adversely affected in any manner, Borrower, at Borrower's expense, shall take all necessary and proper steps for the defense of said title or interest, including the employment of counsel reasonably approved by Lender, the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest.

1.3    <u>Performance of Obligations</u>. Borrower shall pay when due the principal of and the interest on the indebtedness secured hereby, including all charges, fees and other sums required to be paid by Borrower as provided in the Loan Documents, and shall observe, perform and discharge all obligations, and conditions, and comply with all prohibitions, covenants and agreements to be observed, performed or discharged by Borrower set forth in the Loan Documents in accordance with their terms. In the event that Lender determines that Borrower is not adequately performing any of its obligations under this Security Instrument or under any of the other Loan Documents, Lender may, without limiting or waiving any other rights or remedies of Lender hereunder, take such steps with respect thereto as Lender shall deem necessary or proper, and any and all costs and expenses reasonably incurred by Lender in connection therewith, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.4    <u>Insurance</u>.

(a)    Borrower shall, at Borrower's expense, maintain in force and effect on the Property at all times while this Security Instrument continues in effect the following insurance:

(i)    "All-risk" coverage insurance against loss or damage to the Property from all-risk perils (including contingent liability from operation of building laws, demolition costs and increased cost of construction endorsements). The amount of such insurance shall be not less than an amount equal to the greater of: (x) the outstanding principal balance of the Loan and (y) one hundred percent (100%) of the full replacement cost of the Improvements, furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Property and owned by Borrower from time to time, without reduction for depreciation. The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing such coverage or, at Lender's election, by reference to such indexes, appraisals or information as Lender determines in its reasonable discretion. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing the same. Each policy or policies shall contain a replacement cost endorsement and either an

10

agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Lender's approval and shall provide for no deductible in excess of the lesser of (A) $10,000, (B) five percent (5%) of the full replacement cost, or (C) five percent (5%) of the annual net operating income from the Property.

(ii)    Commercial general liability insurance for personal injury, bodily injury, death and property damage liability to be on the so-called "occurrence form" with a combined single limit in amounts not less than $1,000,000.00 (inclusive of umbrella coverage) or such lesser amount as Lender in Lender's sole discretion may accept, for bodily injury, personal injury and property damage, to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; (5) dramshop liability to the extent applicable; and (6) contractual liability covering the indemnities contained in this Security Instrument to the extent available. Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrower and to require an increase in the amount of said liability insurance should Lender deem an increase to be reasonably prudent under then existing circumstances.

(iii)    Insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost of the Improvements, which policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder.

(iv)    If the Real Estate or any part thereof is identified by the Secretary of Housing and Urban Development as being situated in an area now or subsequently designated as having special flood hazards (including, without limitation, those areas designated as Zone A or Zone V), flood insurance in an amount equal to the outstanding principal balance of the Loan or the maximum amount of flood insurance available, whichever is less.

(v)    During the period of any construction on the Real Estate or renovation or alteration of the Improvements, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any Improvements under construction, renovation or alteration in an amount approved by Lender and worker's compensation insurance covering all persons engaged in such construction, renovation or alteration in an amount at least equal to the minimum required by statutory limits of the Jurisdiction in which the Property is located.

(vi)    Rental value or rental income insurance in amounts sufficient to prevent Borrower from becoming a co-insurer within the terms of the applicable policies, and to compensate Borrower for all Rents during a period of not less than one (1) year in which the Property may be damaged or destroyed.

(vii)    Law and ordinance coverage in an amount satisfactory to Lender if the Property, or any part thereof, shall constitute a nonconforming use or structure under applicable zoning ordinances, subdivision and building codes or other laws, ordinances, orders

11

and requirements. In the case of a known exposure, 100% replacement cost is often required for Coverage A (cost to undamaged portion of building) and 10% of the Replacement Cost for both Coverage B (demolition cost) and Coverage C (increased cost of construction).

            (viii)   Such other insurance on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

The "all-risk" commercial property and rental income insurance required under Sections 1.4(a)(i) and (vi) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain commercial property and rental income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 1.4(a)(i) and (vi) above at all times during the term of the Loan; provided, however, Borrower's insurance coverage may exclude perils and acts of terrorism if Borrower also obtains, at Borrower's sole cost and expense, a Terrorism Policy (hereinafter defined). The term "Terrorism Policy", as used herein, shall mean a separate stand-alone terrorism insurance policy obtained by Borrower which corresponds to Borrower's primary insurance exclusion relating to acts or perils of terrorism such that there are no gaps in coverage and being otherwise acceptable to Lender and consistent as to coverage amounts, ratings and conditions with the requirements of this Section 1.4 as it relates to other sorts of insurance coverage. Borrower shall not decline or otherwise terminate any terrorism coverage offered under Borrower's all-risk policy unless a Terrorism Policy is already in place.

All such insurance shall (i) be issued by companies approved by Lender and licensed to do business in the State where the Property is located, with a claims paying ability rating of "A" or better by Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc., and a financial class of X or better by A.M. Best Company, Inc., (ii) contain the complete address of the Real Estate (or a complete legal description), (iii) be for a term of at least one year, (iv) contain deductibles no greater than $10,000.00 or as otherwise required by Lender, and (v) be subject to the approval of Lender as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates.

            (b)   Borrower shall as of the date hereof deliver to Lender evidence that said insurance policies have been paid current as of the date hereof and certified copies of such insurance policies and original certificates of insurance signed by an authorized agent evidencing such insurance satisfactory to Lender. Borrower shall renew all such insurance and deliver to Lender certificates evidencing such renewals at least thirty (30) days before any such insurance shall expire. Without limiting the required endorsements to insurance policies, Borrower further agrees that all such policies shall provide that proceeds thereunder shall be payable to Lender, its successors and assigns, pursuant and subject to a Lender clause (without contribution) of standard form attached to, or otherwise made a part of, the applicable policy and that Lender, its successors and assigns, shall be named as a loss payee and additional insured under all liability insurance policies. The policies of insurance required in subsections (a)(i), (a)(iii), (a)(iv), (a)(v), (a)(vi) and (a)(vii) shall identify Lender as loss payee and Lender under a standard Lender (non-contribution) endorsement. Borrower further agrees that all such insurance policies: (i) shall

12

provide for at least thirty (30) days' prior written notice to Lender prior to any cancellation or termination thereof and prior to any modification thereof which affects the interest of Lender; (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance; and (iii) shall contain a waiver of all rights of subrogation against Lender; (iv) shall contain the following phrase on the face of the document: "This is evidence that the insurance as identified below has been issued, is in force and conveys all the rights and privileges afforded under the policy."; and (v) in the event that any lease requires that any insurance policies affecting the Property contain a waiver of subrogation provision, shall, either by their terms or by endorsement, provide such a waiver. The delivery to Lender of the insurance policies or the certificates of insurance as provided above shall constitute an assignment of all proceeds payable under such insurance policies by Borrower to Lender as further security for the indebtedness secured hereby. In the event of foreclosure of this Security Instrument, or other transfer of title to the Property in extinguishment of such or in part of the secured indebtedness, all right, title and interest of Borrower in and to all proceeds payable under such policies then in force concerning the Property shall thereupon vest in the purchaser at such foreclosure, or in Lender or other transferee in the event of such other transfer of title. Approval of any insurance by Lender shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance. In the event Borrower fails to provide, maintain, keep in force or deliver and furnish to Lender the policies of insurance required by this Security Instrument or evidence of their renewal as required herein, Lender may, but shall not be obligated to, procure such insurance and Borrower shall pay all amounts advanced by Lender, together with interest thereon at the Default Interest Rate (as defined in the Note) from and after the date advanced by Lender until actually repaid by Borrower, promptly upon demand by Lender. Any amounts so advanced by Lender, together with interest thereon, shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Lender shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance.

     1.5    <u>Payment of Taxes</u>. Borrower shall pay or cause to be paid, except to the extent provision is actually made therefor pursuant to Section 1.6 of this Security Instrument, all taxes and assessments which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Borrower shall furnish Lender with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such taxes and assessments at least fifteen (15) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, Borrower may in good faith, by appropriate proceedings and upon notice to Lender, contest the validity, applicability or amount of any asserted tax or assessment so long as (a) such contest is diligently pursued, (b) Lender determines, in its subjective opinion, that such contest suspends the obligation to pay the tax or assessment and nonpayment of such tax or assessment will not result in the sale, loss, forfeiture or diminution of the Property or any part thereof or any interest of Lender therein, and (c) prior to the earlier of the commencement of such contest or the delinquency date of the asserted tax or assessment, Borrower deposits in the Impound Account (as hereinafter defined) an amount determined by Lender to be adequate to cover the payment of

13

such tax or assessment and a reasonable additional sum to cover possible interest, costs and penalties; provided, however, that Borrower shall promptly cause to be paid any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided further that in any event each such contest shall be concluded and the taxes, assessments, interest, costs and penalties shall be paid prior to the date any writ or order is issued under which the Property may be sold, lost or forfeited.

      1.6    <u>Tax and Insurance Impound Account</u>.  Borrower shall establish and maintain at all times while this Security Instrument continues in effect an impound account (the "**Impound Account**") with Lender for payment of real estate taxes and assessments and insurance on the Property and as additional security for the indebtedness secured hereby.  On the date hereof, Borrower shall deposit in the Impound Account an amount determined by Lender to be sufficient (when added to the monthly deposits described herein) to pay the next due annual installment of real estate taxes and assessments on the Property at least one (1) month prior to the delinquency date thereof (if paid in one installment) and the next due annual insurance premiums with respect to the Property at least one (1) month prior to the due date thereof (if paid in one installment). Commencing on the first monthly payment date under the Note and continuing thereafter on each monthly payment date under the Note, Borrower shall pay to Lender, concurrently with the monthly payment due under the Note, deposits in an amount equal to the sum of (i) one-twelfth (1/12) of the amount of the annual real estate taxes and assessments that will next become due and payable on the Property, plus (ii) one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on insurance policies which Borrower is required to maintain hereunder, each as estimated and determined by Lender.  So long as no default hereunder or under the other Loan Documents has occurred and is continuing, all sums in the Impound Account shall be held by Lender in the Impound Account to pay said taxes, assessments and insurance premiums in one installment, in each case before the same become delinquent.  Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all taxes, assessments and insurance premiums to be paid from the Impound Account, and so long as no default hereunder or under the other Loan Documents has occurred and is continuing, Lender shall pay the governmental authority or other party entitled thereto directly to the extent funds are available for such purpose in the Impound Account.  In making any payment from the Impound Account, Lender shall be entitled to rely on any bill, statement or estimate procured from the appropriate public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof.  No interest on funds contained in the Impound Account shall be paid by Lender to Borrower and any interest or other earnings on funds deposited in the Impound Account shall be solely for the account of Lender.  If the total funds in the Impound Account shall exceed the amount of payments actually applied by Lender for the purposes of the Impound Account, plus a one (1) month reserve, such excess may be credited by Lender on subsequent payments to be made hereunder or, at the option of Lender, refunded to Borrower.  If, however, the Impound Account shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency.

14

1.7    Reserves.

(a)    As additional security for the indebtedness secured hereby, Borrower shall establish and maintain at all times while this Security Instrument continues in effect a repair and replacement reserve (the "**Replacement Reserve**") with Lender for payment of costs and expenses incurred by Borrower in connection with capital improvements, repairs and replacements performed at the Property, including, but not limited to, the performance of work to the roofs, chimneys, gutters, downspouts, paving, curbs, ramps, driveways, balconies, porches, patios, exterior walls, exterior doors and doorways, windows, carpets, appliances, fixtures, elevators and mechanical and HVAC equipment (collectively, the "**Repairs**"). Commencing on the first monthly payment date under the Note and continuing thereafter on each monthly payment date under the Note, Borrower shall pay to Lender, concurrently with the monthly payment due under the Note, a deposit to the Replacement Reserve in an amount equal to $5,750.00. So long as no default hereunder or under the other Loan Documents has occurred and is continuing, (i) all sums in the Replacement Reserve shall be held by Lender in the Replacement Reserve to pay the costs and expenses of Repairs and inspections, and (ii) Lender shall, to the extent funds are available for such purpose in the Replacement Reserve, disburse to Borrower the amount paid or incurred by Borrower in performing such Repairs and shall endeavor to do so within ten (10) days following: (a) the receipt by Lender of a written request from Borrower for disbursement from the Replacement Reserve and a certification by Borrower to Lender that the applicable item of Repair has been completed; (b) the delivery to Lender of invoices, receipts or other evidence verifying the cost of performing the Repairs; and (c) affidavits, lien waivers or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property (provided however with respect to requests in excess of $10,000.00 and for which the disbursement shall be made by joint check payable to Borrower and the applicable contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with such capital item, conditional lien waivers for the work to be paid from such disbursement, conditioned only upon such payment); (d) a certification from an inspecting architect or other third party acceptable to Lender describing the completed Repairs and verifying the completion of the Repairs and the value of the completed Repairs; and (e) a new (or amended) certificate of occupancy for the portion of the Improvements covered by such Repairs, if said new (or amended) certificate of occupancy is required by law, or a certification by Borrower that no new (or amended) certificate of occupancy is required by law. Lender shall not be required to make advances from the Replacement Reserve more frequently than one time in any calendar month. Any disbursement by Lender hereunder for a capital item in excess of $10,000.00 and not already paid for by Trustor, shall be made by joint check, payable to Trustor and the applicable contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with such capital item. In making any payment from the Replacement Reserve, Lender shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount. Lender may, at Borrower's expense (not to exceed $2,500.00 annually), make or cause to be made during the term of this Security Instrument an annual inspection of the Property to determine the need, as determined by Lender in its reasonable judgment, for further Repairs of the Property. In the event that such inspection reveals that

15

further Repairs of the Property are required, Lender shall provide Borrower with a written description of the required Repairs and Borrower shall complete such Repairs to the reasonable satisfaction of Lender within ninety (90) days after the receipt of such description from Lender, or such later date as may be approved by Lender in its sole discretion. Interest or other earnings on the funds contained in the Replacement Reserve shall be credited to Borrower as provided in Section 4.28 hereof. In the event that the amounts on deposit or available in the Replacement Reserve are inadequate to pay the cost of the Repairs, Borrower shall pay the amount of such deficiency.

(b)    Prior to the execution of this Security Instrument, Lender has caused the Property to be inspected and such inspection has revealed that the Property is in need of certain maintenance, repairs and/or remedial or corrective work. Contemporaneously with the execution hereof, Borrower has established with Lender a reserve in the amount of $271,111.25 (the "**Repair and Remediation Reserve**"), which amount represents the estimated cost to complete such items of Deferred Maintenance (as defined herein), by depositing such amount with Lender. Borrower shall cause each of the items described in that certain Property Condition Assessment of Gaslight Commons Apartments prepared by Commercial Building Consultants, dated April 12, 2006, relative to the Property, a copy of which has been provided to, and receipt of which is hereby acknowledged by, Borrower (the "**Deferred Maintenance**") (as summarized on Exhibit B attached hereto) to be completed, performed, remediated and corrected to the satisfaction of Lender and as necessary to bring the Property into compliance with all applicable laws, ordinances, rules and regulations on or before 60 days from the date hereof, as such time period may be extended by Lender in its sole discretion. So long as no default hereunder or under the other Loan Documents has occurred and is continuing (a) all sums in the Repair and Remediation Reserve shall be held by Lender in the Repair and Remediation Reserve to pay the costs and expenses of completing the Deferred Maintenance, and (b) Lender shall, to the extent funds are available for such purpose in the Repair and Remediation Reserve, disburse to Borrower the amount paid or incurred by Borrower in completing, performing, remediating or correcting the Deferred Maintenance upon (i) the receipt by Lender of a written request from Borrower for disbursement from the Repair and Remediation Reserve which shall include a certification by Borrower that the applicable item of Deferred Maintenance has been completed in accordance with the terms of this Security Instrument, (ii) delivery to Lender of invoices, receipts or other evidence satisfactory to Lender verifying the costs of the Deferred Maintenance to be reimbursed, (iii) delivery to Lender of a certification from an inspecting architect, engineer or other consultant reasonably acceptable to Lender describing the completed work, verifying the completion of the work and the value of the completed work and, if applicable, certifying that the Property is, as a result of such work, in compliance with all applicable laws, ordinances, rules and regulations relating to the Deferred Maintenance so performed, and (iv) delivery to Lender of affidavits, lien waivers or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished materials or labor to the Property have been paid all amounts due for such labor and materials furnished to the Property. Lender shall not be required to make advances from the Repair and Remediation Reserve more frequently than one time in any calendar month. Any disbursement by Lender hereunder for a capital item in excess of $10,000.00 and not already paid for by Trustor, shall be made by joint check, payable to Trustor and the applicable contractor, supplier, materialman, mechanic, subcontractor

16

or other party to whom payment is due in connection with such capital item. In making any payment from the Repair and Remediation Reserve, Lender shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount. No interest or other earnings on the funds contained in the Repair and Remediation Reserve shall be paid to Borrower and any interest or other earnings on funds deposited into the Repair and Remediation Reserve shall be solely for the account of Lender. In the event that the amounts on deposit or available in the Repair and Remediation Reserve are inadequate to pay the costs of the Deferred Maintenance, Borrower shall pay the amount of such deficiency.

(c)    <u>Intentionally Omitted.</u>

(d)    <u>Intentionally Omitted.</u>

(e)    <u>Interest Reserve.</u>

(i)    As additional security for the indebtedness secured hereby, contemporaneously with the execution hereof, Borrower has established with Lender (and shall constitute a part of the outstanding principal balance) a reserve in the amount of $500,000.00 (the "**Interest Reserve**"). Borrower understands and agrees that, notwithstanding the establishment of the interest reserve as herein required, all of the proceeds of the Note have been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided therein. The Interest Reserve is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment of the costs and expenses described in this Section 1.7(e) in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon an Event of Default, Lender may, but shall not be obligated to, apply at any time the balance then remaining in the Interest Reserve against the indebtedness evidenced by the Note in whatever order Lender shall subjectively determine. No such application of the interest reserve shall be deemed to cure any Event of Default hereunder.

(ii)    For so long as (i) no Event of Default has occurred hereunder or under any of the other Loan Documents, (ii) Borrower has complied with the replenishment of the Interest Reserve as set forth in Section 1.7(e)(iii) below, and (iii) the revenues from the Property are insufficient to make payments of interest on the Loan which are due under the Note, on any Payment Date under the Note on which Lender shall have received Borrower's written request for application of funds in the Interest Reserve to the interest due under the Note (the "**Reserve Request**") (together with evidence acceptable to Lender, in its discretion, that revenues are insufficient) Lender shall advance from the Interest Reserve to itself the amount of the monthly interest set forth in the Interest Reserve Request, provided, however, Lender shall not have any obligation whatsoever to advance any amount from the Interest Reserve as aforesaid unless the Interest Reserve Request is received by Lender on or before the respective Payment Date. Nothing contained herein, including, without limitation, the existence of the Interest Reserve, shall release Borrower of any obligation to make payments under the Note, this Security Instrument or the other Loan Documents strictly in accordance with the terms hereof or thereof and, in this regard, without limiting the generality of the foregoing, should the amounts contained in the interest reserve not be sufficient to pay in full the monthly interest installments,

17

Borrower shall be responsible for paying such deficiency on the payment date of any such monthly interest installment.

(iii)    Borrower agrees that if (i) the amount held in the Interest Reserve is ever less than one (1) month's interest payment under the Note (the amount of which payment will be determined from time to time based on the interest payment made under the Note for the immediately preceding payment period) (the "**Minimum Interest Deposit**"), and (ii) Lender determines that the "**DSCR**" (as defined in the Note) for the Property is less than 1.10:1.0, then Borrower shall replenish the interest reserve within ten (10) days of Lender's notice thereof to $500,000.00.   In addition, if at any time following Lender's receipt of an Interest Reserve Request and Lender's disbursement from the Interest Reserve in accordance with such Interest Reserve Request, Lender determines (based on financial statements delivered to Lender or otherwise) that there were in fact adequate revenues from the Property for Borrower to make the required interest payments due under the Note, Borrower shall replenish the Interest Reserve within ten (10) days of Lender's notice thereof with an amount of funds equal to the amount that Lender disbursed from the Interest Reserve for which Borrower actually had revenues from the Property to make such interest payment under the Note.  No interest or other earnings on the funds contained in the Interest Reserve shall be paid to Borrower and any interest or other earnings on such funds shall be solely for the account of Lender.

1.8    Security Interest In Reserves.

(a)    As additional security for the payment and performance by Borrower of all duties, responsibilities and obligations under the Note and the other Loan Documents, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Lender, and hereby grants to Lender a security interest in, all sums on deposit or due under this Security Instrument and the other Loan Documents including, without limitation, (i) the Impound Account, the Replacement Reserve, the Repair and Remediation Reserve and the Interest Reserve (collectively, the "**Reserves**"), (ii) the accounts into which the Reserves have been deposited, (iii) all insurance on said accounts, (iv) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter evidencing the Reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to the Reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing.  Borrower hereby authorizes and consents to the account into which the Reserves have been deposited being held in Lender's name or the name of any entity servicing the Note for Lender and hereby acknowledges and agrees that Lender, or at Lender's election, such servicing agent, shall have exclusive control over said account.  Notice of the assignment and security interest granted to Lender herein may be delivered by Lender at any time to the financial institution wherein the Reserves have been established, and Lender, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts.  Borrower hereby holds Lender harmless with respect to all risk of loss regarding amounts on deposit in the Reserves, except to the extent that any such loss is caused by the gross negligence or intentional misconduct of Lender.  Borrower hereby knowingly, voluntarily and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Reserves as set

18

forth herein is at Borrower's direction and is not the exercise by Lender of any right of set-off or other remedy upon a default. If a default shall occur hereunder or under any other of the Loan Documents which is not cured within any applicable grace or cure period, then Lender may, without notice or demand on Borrower, at its option: (A) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, reasonable attorneys' fees, costs and expenses) to the indebtedness evidenced by the Note or any other obligations of Borrower under the other Loan Documents in such manner or as Lender shall deem appropriate in its sole discretion, and the excess, if any, shall be paid to Borrower, (B) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, or (C) exercise any other remedies available at law or in equity. No such use or application of the funds contained in the Reserves shall be deemed to cure any default hereunder or under the other Loan Documents.

(b)    The Reserves are solely for the protection of Lender and entail no responsibility on Lender's part beyond the payment of the respective costs and expenses in accordance with the terms thereof and beyond the allowing of due credit for the sums actually received. Upon assignment of this Security Instrument by Lender, any funds in the Reserves shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto shall terminate. The Reserves shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender. Upon full payment of the indebtedness secured hereby in accordance with its terms (or if earlier, the completion of the applicable conditions to release of each Reserve to Lender's satisfaction) or at such earlier time as Lender may elect, the balance in the Reserves then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(c)    Any amounts received by Lender from Borrower may be invested by Lender (or its servicer) for its benefit, and Lender shall not be obligated to pay, or credit, any interest earned thereon to Borrower except as may be otherwise specifically provided in this Security Instrument.

1.9    Casualty and Condemnation.

(a)    Borrower shall give Lender prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof (collectively, an "Insured Event"). All insurance proceeds on the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to it for any loss or diminution in value of the Property, are hereby assigned to and shall be paid to Lender. Lender may participate in any suits or proceedings relating to any such proceeds, causes of action, claims, compensation, awards or recoveries and Lender is hereby authorized, in its own name or in Borrower's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Borrower shall from time to time deliver to Lender any instruments required to permit such participation; provided, however, that Lender

19

shall not have the right to participate in the adjustment of any loss which is not in excess of the lesser of (1) ten percent (10%) of the then outstanding principal balance of the Note, and (2) $350,000.00. Provided no default is then continuing hereunder or under any of the other Loan Documents and no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default hereunder or under any of the other Loan Documents, Lender shall apply any sums received by it under this Section first to the payment of all of its costs and expenses (including, but not limited to, reasonable legal fees and disbursements) incurred in obtaining those sums, and then, as follows:

(i)    In the event that Lender receives insurance proceeds or condemnation awards upon the occurrence of an Insured Event in an amount not in excess of the lesser of (A) ten percent (10%) of the then outstanding principal balance of the Note, and (B) $350,000.00 (collectively, the "**Threshold Amount**"), Lender shall, to the extent such insurance proceeds or condemnation awards are available for such purpose, disburse to Borrower the amount paid or incurred by Borrower as a result of any such Insured Event for costs and expenses incurred by Borrower to repair or restore the Property pursuant to the disbursement provisions of Section 1.7 above.

(ii)    In the event any proceeds or awards from an Insured Event exceed the Threshold Amount but less than sixty percent (60%) of the Improvements located on the Real Estate have been taken or destroyed, then if:

(A)    the Property can, in Lender's reasonable judgment, with diligent restoration or repair, be returned to a condition at least equal to the condition thereof that existed prior to the casualty or partial taking causing the loss or damage by the earlier to occur of the following dates: (1) six (6) months after the receipt of insurance proceeds or condemnation awards by either Borrower or Lender, and (2) six (6) months prior to the stated maturity date of the Note, and

(B)    all necessary governmental approvals can be obtained to allow the rebuilding and re-occupancy of the Property as described in Section 1.9(a)(ii)(A) above, and

(C)    there are sufficient sums available (through insurance proceeds or condemnation awards and contributions by Borrower, the full amount of which shall at Lender's option have been deposited with Lender) for such restoration or repair (including, without limitation, for any reasonable costs and expenses of Lender to be incurred in administering said restoration or repair) and for payment of principal and interest to become due and payable under the Note during such restoration or repair, and

(D)    the economic feasibility of the Improvements after such restoration or repair will be such that income from their operation is reasonably anticipated to be sufficient to pay operating expenses of the Property and debt service on the indebtedness secured hereby in full with the same coverage ratio considered by Lender in its determination to make the Loan, and

20

(E)    Borrower shall have delivered to Lender, at Borrower's sole cost and expense, an appraisal report from an appraiser, in form and substance satisfactory to Lender, appraising the value of the Property as proposed to be restored or repaired to be not less than the appraised value of the Property considered by Lender in its determination to make the Loan,

then, Lender shall, solely for the purposes of such restoration or repair, advance so much of the remainder of such sums as may be required to facilitate such restoration or repair, and any funds deposited by Borrower therefor, to Borrower in the manner and upon such terms and conditions as would be required by a prudent interim construction lender, including, but not limited to, the prior approval by Lender of plans and specifications, contractors and the form of construction contracts and the furnishing to Lender of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors in form and substance reasonably satisfactory to Lender. Any remaining proceeds shall be applied by Lender for payment of the indebtedness secured hereby in whatever order as Lender directs, or released to Borrower, in its absolute discretion. Borrower shall, in good faith, undertake reasonable efforts to cause the conditions described in this Section 1.9(a)(ii) to be fully satisfied (e.g., Borrower shall timely make applications for necessary governmental permits, shall order an appropriate appraisal report, etc.). If such conditions are satisfied, Borrower shall be obligated to undertake restoration and repair of the damaged Improvements subject to the terms of this Section 1.9. Any disbursement pursuant to this Section 1.9(a)(ii) of sums by Lender shall, subject to Borrower's satisfaction of the provisions hereof, be in a manner to promptly facilitate the restoration or repair of the Property. In the event Borrower fails to meet the requirements of this Section 1.9(a)(ii), then Lender may elect in its absolute discretion and without regard to the adequacy of Lender's security, to accelerate the maturity date of the Note and declare any and all of the indebtedness secured hereby to be immediately due and payable and apply the remainder of such sums to the payment of the secured indebtedness in whatever order Lender directs in its sole discretion, with any remainder being paid to Borrower.

(iii)    In all other cases, namely, in the event that sixty percent (60%) or more of the Improvements located on the Real Estate have been taken or destroyed, Lender may elect, in Lender's absolute discretion and without regard to the adequacy of Lender's security, to (A) accelerate the maturity date of the Note and declare any and all indebtedness secured hereby to be immediately due and payable and apply the remainder of such sums received pursuant to this Section to the payment of the secured indebtedness in whatever order Lender directs in its absolute discretion, with any remainder being paid to Borrower, or (B) make insurance or condemnation proceeds available to Borrower for repair or restoration if Borrower establishes to the satisfaction of Lender, in its sole discretion, that Borrower otherwise satisfies the requirements of Section 1.9(a)(ii) above. Should Lender make the election described immediately above in item (B) of this Section 1.9(a)(iii), Borrower shall be obligated to undertake restoration and repair of the damaged Improvements consistent with the provisions of this Section 1.9.

(b)    Any reduction in the indebtedness secured hereby resulting from Lender's application of any sums received by it hereunder shall take effect only when Lender actually receives such sums and elects to apply such sums to the indebtedness secured hereby and, in any

21

event, the unpaid portion of the indebtedness secured hereby shall remain in full force and effect and Borrower shall not be excused in the payment thereof. Partial payments received by Lender, as described in the preceding sentence, shall be applied as set forth in Section 1.02(c) of the Note. If Borrower undertakes to restore or repair the Property after the occurrence of a casualty or partial taking of the Property as provided above, Borrower shall promptly and diligently, at Borrower's sole cost and expense and regardless of whether the insurance proceeds or condemnation award, as appropriate, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to such casualty or partial taking in accordance with the foregoing provisions and Borrower shall pay to Lender all costs and expenses of Lender incurred in administering said rebuilding, restoration or repair, provided that Lender makes such proceeds or award available for such purpose. Borrower agrees to execute and deliver from time to time such further instruments as may be requested by Lender to confirm the foregoing assignment to Lender of any award, damage, insurance proceeds, payment or other compensation. Borrower hereby irrevocably constitutes and appoints Lender the attorney-in-fact of Borrower (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof), with full power of substitution, subject to the terms of this Section, to settle for, collect and receive any such awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittance therefor.

1.10    Mechanics' Liens.  Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Real Estate or the Improvements; provided, however, that Borrower shall have the right to contest in good faith any such claim or demand, so long as it does so diligently, by appropriate proceedings and without prejudice to Lender and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event Borrower shall contest any such claim or demand, Borrower shall promptly notify Lender of such contest and thereafter shall, upon Lender's request, promptly provide a bond, cash deposit or other security satisfactory to Lender to protect Lender's interest and security should the contest be unsuccessful. If Borrower shall fail to immediately discharge or provide security against any such claim or demand as aforesaid, Lender may do so and any and all expenses incurred by Lender, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.11    Assignment of Leases and Rents.  Borrower acknowledges and confirms that, as additional collateral security for the payment of the indebtedness secured hereby, and cumulative of any and all rights and remedies herein provided, it has executed and delivered to Lender an Assignment of Leases and Rents dated of even date herewith (the "**Assignment**"), intending such Assignment to create a present, absolute assignment to Lender of the Leases and the Rents. Upon the occurrence of a default under this Security Instrument which has not been cured within

22

any applicable grace or cure period, Lender shall be entitled to exercise any or all of the remedies provided in this Security Instrument and in the Assignment, including, without limitation, the appointment of a receiver. The Assignment shall continue in full force and effect during any period of foreclosure or redemption with respect to the Property.

    1.12    <u>Leases and Licenses.</u>

        (a)    Borrower covenants and agrees that it shall not enter into any Lease affecting 5,000 square feet or more of the Property or having a term (including all options to extend or renew) of more than ten (10) years without the prior written approval of Lender, which approval shall not be unreasonably withheld. The request for approval of each such proposed new lease shall be made to Lender in writing and shall be accompanied by: (i) such biographical and financial information about the proposed tenant as Lender may require in conjunction with its review, (ii) a copy of the proposed form of lease, and (iii) a summary of the material terms of such proposed lease (including, without limitation, rental terms and the term of the proposed lease and any options). It is acknowledged that Lender intends to include among its criteria for approval of any such proposed lease the following: (A) such lease shall be with a bona-fide arm's length tenant; (B) such lease shall not contain any rental or other concessions which are not then customary and reasonable for similar properties and leases in the market area of the Real Estate; (C) such lease shall provide that the tenant pays for its expenses; (D) the rental shall be at least at the market rate then prevailing for similar properties and leases in the market areas of the Real Estate; and (E) such lease shall contain subordination and attornment provisions in form and content acceptable to Lender. Failure of Lender to approve or disapprove any such proposed lease within ten (10) business days after receipt of such written request and all the documents and information required to be furnished to Lender with such request shall be deemed approval, <u>provided</u> that the written request for approval specifically and clearly stated, **IN 14 POINT TYPE OR GREATER,** that if Lender fails to respond to such request within ten (10) business days, Lender's approval shall be deemed to have been granted.

        (b)    All Leases shall be written on the standard form lease (without any material changes) which Lender has approved and shall be on arm's-length terms consistent with the terms for similar leases in the market area of the Real Estate, shall provide for free rent only if the same is consistent with prevailing market conditions and shall provide for market rents then prevailing in the market area of the Real Estate. Such Leases shall also provide for Security Deposits in reasonable amounts. Borrower shall submit to Lender for Lender's approval, which approval shall not be unreasonably withheld, prior to the execution thereof, any proposed lease, license or occupancy agreement of the Improvements or any portion thereof that differs materially and adversely from the aforementioned form lease. Borrower shall not execute any lease, license or occupancy agreement for all or a substantial portion of the Property, except for an actual occupancy by the tenant, lessee or licensee thereunder, and shall at all times promptly and faithfully perform, or cause to be performed, all of the covenants, conditions and agreements contained in all Leases with respect to the Property, now or hereafter existing, on the part of the landlord, lessor or licensor thereunder to be kept and performed. In addition to the requirements set forth in <u>Section 1.18(c)</u> of this Security Instrument, Borrower shall furnish to Lender, within ten (10) days after a request by Lender to do so, a current rent roll certified by Borrower as being true and correct containing the names of all tenants, lessees and licensees with respect to the

23

Property, the terms of their respective Leases, the spaces occupied and the rentals or fees payable thereunder and the amount of each tenant's security deposit. Upon the request of Lender, Borrower shall deliver to Lender a copy of each such Lease. Borrower shall not do or suffer to be done any act that might result in a default by the landlord, lessor or licensor under any such Lease or allow the tenant, lessee or licensee thereunder to withhold payment of rent and, except as otherwise expressly permitted by the terms of <u>Section 1.13</u> hereof, shall not further assign any such Lease or any such rents. Borrower, at no cost or expense to Lender, shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases. Borrower shall not, without the prior written consent of Lender, modify any of the non-residential Leases, terminate or accept the surrender of any non-residential Leases, or waive or release any other party from the performance or observance of any obligation or condition under such non-residential Leases.

     1.13   <u>Alienation and Further Encumbrances</u>.

     (a)   Borrower acknowledges that Lender has relied upon the principals of Borrower and their experience in owning and operating properties similar to the Property in connection with the closing of the Loan. Accordingly, except as specifically allowed hereinbelow in this <u>Section 1.13</u> and notwithstanding anything to the contrary contained in <u>Section 4.5</u> hereof, in the event that the Property or any part thereof or interest therein shall be sold (including any installment sales agreement), conveyed, disposed of, alienated, hypothecated, leased (except as to tenants of space in the Improvements in accordance with the provisions of <u>Section 1.12</u> hereof), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Borrower shall be divested of its title to the Property or any interest therein, in any manner or way, whether voluntarily or involuntarily, without the prior written consent of Lender being first obtained, which consent may be withheld in Lender's sole discretion, then, the same shall constitute a default hereunder and Lender shall have the right, at its option, to declare any or all of the indebtedness secured hereby, irrespective of the maturity date specified in the Note, immediately due and payable and to otherwise exercise any of its other rights and remedies contained in <u>Article III</u> hereof. If such acceleration is during any period when a prepayment fee is payable pursuant to the provisions set forth in the Note, then, in addition to all of the foregoing, such prepayment fee shall also then be immediately due and payable to the same end as though Borrower were prepaying the entire indebtedness secured hereby on the date of such acceleration. For the purposes of this Section, the sale, conveyance, transfer, disposition, alienation, hypothecation, pledge or encumbering (whether voluntarily or involuntarily) of all or any portion of the ownership interest in (or, directly or indirectly through constituent parties, any of the ultimate beneficial ownership interest in) Borrower shall be deemed to be a transfer of an interest in the Property. Notwithstanding the foregoing, however, transfers or assignments of ownership interests in Borrower (or its constituent parties) may be undertaken without the consent of Lender in the following circumstances:

     (i)   In the case of a Borrower which is a limited partnership, up to 49% of the limited partnership interests in Borrower shall be freely transferable so long as those persons responsible for the management and control of Borrower and the Property remain unchanged following such transfer.

24

(ii)    In the case of a Borrower which constitutes a limited liability company, up to 49% of the non-managing membership interests in Borrower shall be freely transferable so long as those persons responsible for the management and control of Borrower and the Property remain unchanged following such transfer.

(iii)    In the case of a Borrower which constitutes a corporation, up to 49% of the aggregate of the issued and outstanding capital stock of Borrower may be sold or assigned, taking into account (A) any prior sales or assignments, and (B) the effective change in ownership resulting from any issuance of new shares of capital stock in Borrower or its constituent party.

(iv)    Gifts for estate planning purposes of any individual's interests in Borrower or in any of Borrower's partners, members or joint venturers to the spouse or any lineal descendant of such individual, or to a trust for the benefit of any one or more of such individual, spouse or lineal descendant, shall not be a default under this Security Instrument so long as Borrower is reconstituted, if required, following such gift and so long as those persons responsible for the management of the Property and Borrower remain unchanged following such gift or any replacement management is approved by Lender.

(v)    Involuntary assignments or transfers caused by the death, incompetence or dissolution of Borrower, one of its constituent parties or the owner of one of its constituent parties are permitted if: (A) Borrower is reconstituted, if required, following such death, incompetence or dissolution, and (B) those persons responsible for the management and control of Borrower and the Property remain unchanged as a result of such death, incompetence or dissolution or any replacement management is approved by Lender.

In all cases where transfer or assignment of ownership interests is allowed pursuant to this Section 1.13(a), the proportionate ownership which is proposed to be transferred shall be calculated so as to take into account prior transfers or assignments and not less than ten (10) business days prior to the date of such transfer or assignment, Borrower shall give Lender written notice of such transfer or assignment together with copies of all instruments effecting such transfer or assignment and such other information as shall reasonably allow Lender to determine if such transfer or assignment meets the criteria set forth herein. Furthermore, the sale, conveyance, transfer, disposition, alienation, hypothecation, pledge or encumbering (whether voluntarily or involuntarily) of all or any portion of the ownership interest in (or, directly or indirectly through constituent parties, any of the ultimate beneficial ownership interest in) any guarantor of Borrower's obligation hereunder or under any of the other Loan Documents shall constitute a default hereunder and Lender shall have the right to exercise its various remedies described hereinabove; provided, however, that ownership interests in any such guarantor may be transferred in a manner consistent with the allowable transfers of ownership interests in Borrower described hereinabove.

(b)    In the event that the Property or interests in Borrower are sold, conveyed or otherwise transferred ("Sale") during the Loan term, except as and to the extent permitted in Section 1.13(a) above, the secured indebtedness shall be due in full upon such Sale. The Loan is not assumable.

25

(c)    For purposes of this <u>Section 1.13</u>, a change of control of Borrower (or its managing member or general partner) shall be deemed to have occurred if there is any change in the identity of the individual or entities or group of individuals or entities who have the right by virtue of any partnership agreement, articles of incorporation, by-laws, articles of organization, operating agreement or any other agreement, with or without taking any formative action, to cause Borrower (or its managing member or general partner) to take some action or to prevent, restrict or impede Borrower (or its managing member or general partner) from taking some action which, in either case, Borrower (or its managing member or general partner) could take or could refrain from taking were it not for the rights of such individuals or entities.

1.14    <u>Payment of Utilities, Assessments, Charges, Etc.</u>  Borrower shall pay when due all utility charges which are incurred by Borrower or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services furnished to the Real Estate and/or the Improvements and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Real Estate and/or the Improvements or any portion thereof, whether or not such assessments or charges are or may become liens thereon.  Borrower shall pay all operating expenses relating to the Property when due and shall not distribute any cash flow generated by the Property to its shareholders, partners or members until all such operating expenses relating to the Property have been paid in full.

1.15    <u>Access Privileges and Inspections.</u>  Lender and the agents, representatives and employees of Lender shall, subject to the rights of tenants, have full and free access to the Real Estate and the Improvements and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Borrower relating to the Property.  Borrower shall lend assistance to all such agents, representatives and employees of Lender.

1.16    <u>Waste; Alteration of the Property.</u>  Borrower shall not commit, suffer or permit any waste on the Property nor take any actions that might invalidate any insurance carried on the Property.  Borrower shall maintain the Property in good condition and repair.  No part of the Improvements may be removed, demolished or materially altered, without the prior written consent of Lender.  Without the prior written consent of Lender, Borrower shall not commence construction of any improvements on the Real Estate other than improvements required for the maintenance or repair of the Property.

1.17    <u>Zoning; Use.</u>  Without the prior written consent of Lender, Borrower shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Real Estate or the Improvements.  Borrower shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Real Estate or the Improvements. Borrower shall comply with all existing and future requirements of all governmental authorities having jurisdiction over the Property.  Borrower shall keep all licenses, permits, franchises, certificates of occupancy, consents, and other approvals necessary for the operation of the Property in full force and effect.  Borrower shall operate the Property as multifamily apartments for so long as the indebtedness secured hereby is outstanding.  If, under applicable zoning provisions, the use of all or any part of the Real Estate or the Improvements is

26

or becomes a nonconforming use, Borrower shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Lender. Further, without Lender's prior written consent, Borrower shall not file or subject any part of the Real Estate or the Improvements to any declaration of condominium or cooperative or convert any part of the Real Estate or the Improvements to a condominium, cooperative or other form of multiple ownership and governance.

1.18    Financial Statements and Books and Records. Borrower shall keep accurate books and records of account of the Property and its own financial affairs sufficient to permit the preparation of financial statements therefrom in accordance with generally accepted accounting principles. Lender and its duly authorized representatives shall have the right to examine, copy and audit Borrower's records and books of account at all reasonable times. So long as this Security Instrument continues in effect, Borrower shall provide to Lender, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the following financial statements and information, all of which must be certified to Lender as being true and correct by Borrower or the entity to which they pertain, as applicable, be prepared in accordance with generally accepted accounting principles consistently applied and be in form and substance acceptable to Lender:

        (a)    copies of all tax returns filed by Borrower, within sixty (60) days after the date of filing;

        (b)    monthly operating statements for the Property, within fifteen (15) days after the end of each calendar month;

        (c)    current rent rolls for the Property, within fifteen (15) days after the end of each calendar month;

        (d)    annual balance sheets for the Property and annual financial statements for Borrower, each principal, manager or general partner in Borrower, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the loan secured hereby within ninety (90) days after the end of each calendar year; and

        (e)    such other information with respect to the Property, Borrower, the principals, members or general partners in Borrower, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the loan secured hereby, which may be requested from time to time by Lender, within a reasonable time after the applicable request.

If any of the aforementioned materials are not furnished to Lender within the applicable time periods, then, in addition to all other rights and remedies of Lender hereunder, Borrower shall pay to Lender a late fee of $250.00. Further, if any of the aforementioned materials are not furnished to Lender within the applicable time periods, or Lender is dissatisfied with the contents of any of the foregoing, in addition to any other rights and remedies of Lender contained herein, Lender shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by Lender, in which event Borrower agrees to pay, or to reimburse Lender for, any expense of such audit and further agrees to provide all necessary information to said accountant and to otherwise cooperate in the making of such audit.

27

Borrower agrees that any and all materials furnished hereunder are the property of Lender (and Lender's servicer) and may be released and made available to such parties as Lender or its servicer deems appropriate, including any Rating Agency responsible for rating securities issued in any Secondary Market Transaction.    For purposes hereof, a **"Secondary Market Transaction"** shall be (i) any sale or assignment of this Security Instrument, the Note and the other Loan Documents to one or more investors as a whole loan; (ii) a participation of the Loan to one or more investors, (iii) any deposit of this Security Instrument, the Note and the other Loan Documents with a trust or other entity which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or other entity, or (iv) any other sale, assignment or transfer of the Loan or any interest therein to one or more investors. At any time during which the Loan is an asset of a securitization or is otherwise an asset of any rated transaction, **"Rating Agency"** shall mean the rating agency or rating agencies that from time to time rate the securities, certificates or other instruments issued in connection with such securitization or other transaction.

    1.19   <u>Further Documentation</u>.    Borrower shall, on the request of Lender in its reasonable discretion and at the expense of Borrower, promptly correct any defect, error or omission which may be discovered in the contents of this Security Instrument or in any of the other Loan Documents and promptly execute, acknowledge, deliver and record or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Security Instrument and the other Loan Documents or as may be deemed advisable by Lender to protect, continue or preserve the liens and security interests hereunder, including, without limitation, security instruments, financing statements and continuation statements.

    1.20   <u>Payment of Costs; Advances to Protect Property</u>.

    (a)   Borrower shall pay all reasonable costs and expenses of every character incurred in connection with the closing of the Loan or otherwise attributable or chargeable to Borrower as the owner of the Property, including, without limitation, appraisal fees, recording fees, documentary, stamp, mortgage or intangible taxes, brokerage fees and commissions, title policy premiums and title search fees, uniform commercial code/tax lien/litigation search fees, escrow fees and reasonable attorneys' fees.

    (b)   Without limiting or waiving any other rights and remedies of Lender hereunder, if Lender determines that Borrower is not adequately performing or has failed to perform any of its obligations, covenants or agreements contained in this Security Instrument or in any of the other Loan Documents and such inadequacy or failure is not cured within any applicable grace or cure period, or if any action or proceeding of any kind (including, but not limited to, any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding) is commenced which might affect Lender's interest in the Property or Lender's right to enforce its security, then Lender may, at its option, with or without notice to Borrower, make any appearances, disburse or advance any sums and take any actions as may be necessary or desirable to protect or enforce the security of this Security Instrument or to remedy the failure of Borrower to perform its covenants and agreements (without, however, waiving any default of Borrower). Borrower agrees to pay on demand all expenses of Lender reasonably incurred with respect to the foregoing (including, but not limited to, reasonable fees and disbursements of

counsel), together with interest thereon at the Default Interest Rate (as defined in the Note) from and after the date on which Lender incurs such expenses until reimbursement thereof by Borrower. Any such expenses so incurred by Lender, together with interest thereon as provided above, shall be additional indebtedness of Borrower secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. The necessity for any such actions and of the amounts to be paid shall be determined by Lender in its sole and absolute discretion. Lender is hereby empowered to enter and to authorize others to enter upon the Property or any part thereof for the purpose of performing or observing any such defaulted term, covenant or condition without thereby becoming liable to Borrower or any person in possession holding under Borrower. Borrower hereby acknowledges and agrees that the remedies set forth in this Section 1.20(b) shall be exercisable by Lender, and any and all payments made or costs or expenses incurred by Lender in connection therewith shall be secured hereby and shall be, without demand, immediately repaid by Borrower with interest thereon at the Default Interest Rate (as defined in the Note), notwithstanding the fact that such remedies were exercised and such payments made and costs incurred by Lender after the filing by Borrower of a voluntary case or the filing against Borrower of an involuntary case pursuant to or within the meaning of the Bankruptcy Reform Act of 1978, as amended (the "**Bankruptcy Act**"), Title 11 U.S.C., or after any similar action pursuant to any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable to Borrower, Lender, any guarantor or indemnitor, the secured indebtedness or any of the Loan Documents. This indemnity shall survive payment in full of the indebtedness secured hereby. This Section 1.20(b) shall not be construed to require Lender to incur any expenses, make any appearances or take any actions.

1.21    Security Interest. This Security Instrument is also intended to encumber and create a security interest in, and Borrower hereby grants to Lender a security interest in, all Reserves (as hereinabove defined), fixtures, chattels, accounts, equipment, inventory, contract rights, general intangibles and other personal property included within the Property, all renewals, replacements of any of the aforementioned items, or articles in substitution therefor or in addition thereto or the proceeds thereof (said property is hereinafter referred to collectively as the "**Collateral**"), whether or not the same shall be attached to the Real Estate or the Improvements in any manner. It is hereby agreed that, to the extent permitted by law, all of the foregoing property is to be deemed and held to be a part of and affixed to the Real Estate and the Improvements. The foregoing security interest shall also cover Borrower's leasehold interest in any of the foregoing property which is leased by Borrower. Notwithstanding the foregoing, all of the foregoing property shall be owned by Borrower and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Lender. Borrower shall promptly replace all of the Collateral subject to the lien or security interest of this Security Instrument when worn out or obsolete with Collateral comparable to the worn out or obsolete Collateral when new and will not, without the prior written consent of Lender, remove from the Real Estate or the Improvements any of the Collateral subject to the lien or security interest of this Security Instrument except such as is replaced by an article of equal suitability and value as above provided, owned by Borrower free and clear of any lien or security interest except that created by this Security Instrument and the other Loan Documents and except as otherwise expressly permitted by the terms of Section 1.13 of this Security Instrument. All of the Collateral shall be kept at the location of the Real Estate

29

except as otherwise required by the terms of the Loan Documents. Borrower shall not use any of the Collateral in violation of any applicable statute, ordinance or insurance policy.

  1.22 <u>Security Agreement</u>. This Security Instrument constitutes both a real property mortgage and a "security agreement" between Borrower and Lender with respect to the Collateral in which Lender is granted a security interest hereunder, and, cumulative of all other rights and remedies of Lender hereunder, Lender shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code. Borrower hereby agrees to execute and deliver on demand and hereby irrevocably constitutes and appoints Lender the attorney-in-fact of Borrower to execute and deliver and, if appropriate, to file with the appropriate filing officer or office such security agreements, financing statements, continuation statements or other instruments as Lender may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby. Borrower agrees to furnish Lender with notice of any change in the name, identity, corporate structure, residence, or principal place of business or mailing address of Borrower within ten (10) days after the effective date of any such change. Expenses of retaking, holding, preparing for sale, selling or the like (including, without limitation, Lender's reasonable attorneys' fees and legal expenses), together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. If notice is required by law, Lender shall give Borrower at least ten (10) days' prior written notice of the time and place of any public sale of such property or of the time of or after which any private sale or any other intended disposition thereof is to be made, and if such notice is sent to Borrower, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Borrower. No such notice is necessary for any such property which is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market. Any sale made pursuant to the provisions of this <u>Section 1.22</u> shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the foreclosure sale as provided in <u>Section 3.1(e)</u> hereof upon giving the same notice with respect to the sale of the Property hereunder as is required under said <u>Section 3.1(e)</u>. Furthermore, to the extent permitted by law, in conjunction with, in addition to or in substitution for the rights and remedies available to Lender pursuant to any applicable Uniform Commercial Code:

    (a) In the event of a foreclosure sale, the Property may, at the option of Lender, be sold as a whole; and

    (b) It shall not be necessary that Lender take possession of the aforementioned Collateral, or any part thereof, prior to the time that any sale pursuant to the provisions of this <u>Section 1.22</u> is conducted and it shall not be necessary that said Collateral, or any part thereof, be present at the location of such sale; and

    (c) Lender may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of the sale, but in the name and on behalf of Lender.

30

Borrower will not change the principal place of business or chief executive office set forth below, or change the State of its organization or registration, or change its name, without in each instance the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned. Lender's consent will, however, be conditioned upon, among other things, the execution and delivery of additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Collateral as a result of such changes. The name, principal place of business and chief executive office of Borrower (as Debtor under any applicable Uniform Commercial Code), as of the date hereof, are:

> Gaslight Commons Apartments Co., LLC
> c/o Green Realty Development Company, LLC
> 81 Pondfield Road, Suite 334
> Bronxville, New York 10708

The name and address of Lender (as Secured Party under any applicable Uniform Commercial Code), as of the date hereof, are:

> Potomac Realty Capital, LLC
> 75 Second Avenue, Suite 605
> Needham, Massachusetts 02494
> Attention: Daniel Palmier

    1.23    Easements and Rights-of-Way. Borrower shall not grant any easement or right-of-way with respect to all or any portion of the Real Estate or the Improvements without the prior written consent of Lender. The purchaser at any foreclosure sale hereunder may, at its discretion, disaffirm any easement or right-of-way granted in violation of any of the provisions of this Security Instrument and may take immediate possession of the Property free from, and despite the terms of, such grant of easement or right-of-way. If Lender consents to the grant of an easement or right-of-way, Lender agrees to grant such consent without charge to Borrower other than reasonable expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender in the review of Borrower's request and, if applicable, in the preparation of documents relating to the subordination of this Security Instrument to such easement or right-of-way.

    1.24    Compliance with Laws.

    (a)    Borrower shall at all times comply with all statutes, ordinances, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including, but not limited to, those concerning employment and compensation of persons engaged in operation and maintenance of the Property and any environmental or ecological requirements, even if such compliance shall require structural changes to the Property; provided, however, that Borrower may, upon providing Lender with security satisfactory to Lender, proceed diligently and in good faith to contest the validity or applicability of any such statute, ordinance, regulation or requirement so long as during such contest the Property shall not be subject to any lien, charge, fine or other liability and shall not be in danger of being forfeited,

31

lost or closed. Borrower shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any lease of or any other agreement applicable to the Property or any applicable law, rule, regulation or order or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

(b)    Borrower agrees that the Property shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 and all other state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively **"Access Laws"**). Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

1.25    _Additional Taxes._  In the event of the enactment after this date of any law of the State where the Property is located or of any other governmental entity deducting from the value of the Property for the purpose of taxation any lien or security interest thereon, or imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of mortgages or security agreements or debts secured by mortgages or security agreements or the interest of the Lender or secured party in the property covered thereby, or the manner of collection of such taxes, so as to adversely affect this Security Instrument or the indebtedness secured hereby or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges or liens, or reimburse Lender therefor; provided, however, that if in the opinion of counsel for Lender (a) it might be unlawful to require Borrower to make such payment, or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in either such event, Lender may elect, by notice in writing given to Borrower, to declare all of the indebtedness secured hereby to be and become due and payable in full, thirty (30) days from the giving of such notice.

1.26    _Borrower's Waivers._  To the full extent permitted by law, Borrower agrees that Borrower shall not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, moratorium or extension, or any law now or hereafter in force providing for the reinstatement of the indebtedness secured hereby prior to any sale of the Property to be made pursuant to any provisions contained herein or prior to the entering of any decree, judgment or order of any court of competent jurisdiction, or any right under any statute to redeem all or any part of the Property so sold. To the full extent permitted by law, Borrower shall not have or assert any right under any statute or rule of law pertaining to the exemption of homestead or other exemption under any federal, state or local law now or hereafter in effect, the administration of estates of decedents or any other matters whatsoever to defeat, reduce or affect the right of Lender under the terms of this Security Instrument to a sale of the Property, for the collection of the secured indebtedness without any prior or different resort for collection, or the right of Lender under the terms of this Security Instrument to the payment of the indebtedness secured hereby out of the proceeds of

32

sale of the Property in preference to every other claimant whatever. Borrower, for Borrower and Borrower's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily with and upon the advice of competent counsel waives, releases, relinquishes and forever forgoes: (a) all rights of valuation, appraisement, stay of execution, reinstatement and notice of election or intention to mature or declare due the secured indebtedness (except such notices as are specifically provided for herein); (b) all right to a marshaling of the assets of Borrower, including the Property, to a sale in the inverse order of alienation, or to direct the order in which any of the Property shall be sold in the event of foreclosure of the liens and security interests hereby created and agrees that any court having jurisdiction to foreclose such liens and security interests may order the Property sold as an entirety; (c) all rights and periods of redemption provided under applicable law; and (d) all present and future statutes of limitations as a defense to any action to enforce the provisions of this Security Instrument or to collect any of the indebtedness secured hereby to the fullest extent permitted by law, and agrees that it shall not solicit or aid the solicitation of the filing of any Petition (as hereinafter defined) against Borrower, whether acting on its own behalf or on behalf of any other party. Without limiting the generality of the foregoing, Borrower shall not (i) provide information regarding the identity of creditors or the nature of creditors' claims to any third party unless compelled to do so by order of a court of competent jurisdiction or by regulation promulgated by a governmental agency; or (ii) pay the legal fees or expenses of any creditor of or interest holder in Borrower with respect to any matter whatsoever.

1.27    **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**

(a)    **BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF ALABAMA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THE NOTE, THIS SECURITY INSTRUMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF MONTGOMERY, ALABAMA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 4.4 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).**

33

(b)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE INDEBTEDNESS SECURED HEREBY OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MANAGERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

1.28    Contractual Statute of Limitations.   Borrower hereby agrees that any claim or cause of action by Borrower against Lender, or any of Lender's directors, officers, partners, members, employees, agents, accountants or attorneys, based upon, arising from or relating to the indebtedness secured hereby, or any other matter, cause or thing whatsoever, whether or not relating thereto, occurred, done, omitted or suffered to be done by Lender or by Lender's directors, officers, partners, members, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one (1) year after Borrower first acquires or reasonably should have acquired knowledge of the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter.   Borrower agrees that such one (1) year period of time is reasonable and sufficient time for a borrower to investigate and act upon any such claim or cause of action.   The one (1) year period provided herein shall not be waived, tolled or extended except by the specific written agreement of Lender.   This provision shall survive any termination of this Security Instrument or any of the other Loan Documents.

1.29    Management.   The management of the Property shall be by either:   (a) Borrower or an entity affiliated with Borrower approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Lender.   Such management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender.   Any management fee for the Property in excess of four percent (4%) of effective gross rental income shall be subordinated as and to the extent set forth in Section 5 of the Assignment and Subordination of Management Agreement of even date between Borrower, Lender and the Property manager.   In no event shall any manager be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender.   In the event of default hereunder or under any management contract then in effect, which default is not cured within any applicable grace or cure period, Lender shall have the right to terminate, or to direct Borrower to terminate, such management contract upon thirty (30) days' notice and to retain, or to direct Borrower to retain, a new management agent approved by Lender.   All Rents and Profits generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property,

34

including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to this Security Instrument and the other Loan Documents, and none of the Rents and Profits generated by or derived from the Property shall be diverted by Borrower and utilized for any other purposes unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.

1.30   Hazardous Materials and Environmental Concerns.

(a)   Borrower hereby represents and warrants to Lender that, except to the extent disclosed in the Phase I Environmental Site Assessment Report Gaslight Commons Apartments prepared by LandAmerica Commercial Services dated March 28, 2006 (the "**Report**"): (i) the Property is not, and to the best of Borrower's knowledge, information and belief, after due inquiry and investigation comprised of the Report and Borrower's Due Diligence, the Property has not been, in direct or indirect violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination, remediation or human health or safety (including the regulation or remediation of Hazardous Substances as defined below) (collectively, "**Environmental Laws**"), all as amended; (ii) no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, radon, lead-based paint, flammable explosives, radioactive materials, Mold, infectious substances or raw materials which may include hazardous constituents) or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "**Hazardous Substances**") are located on or have been handled, manufactured, generated, stored, processed, transported to or from, or disposed of on or Released or discharged from the Property (including underground contamination) except for those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws; (iii) the Property is not subject to any private or governmental lien or judicial, administrative or other notice or action relating to Hazardous Substances or noncompliance with Environmental Laws, nor is Borrower aware of any basis for such lien, notice or action; (iv) there are no underground storage tanks or other underground storage receptacles (whether active or abandoned) for Hazardous Substances on the Property; (v) Borrower has received no notice of, and to the best of Borrower's knowledge and belief, after due inquiry and investigation, there does not exist any investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property, nor does Borrower know of any basis for such investigation, action, proceeding or claim; (vi) Borrower has received no notice that, and to the best of Borrower's knowledge and belief after due inquiry and investigation, there has been no claim by any party that, any use, operation or condition of the Property has caused any nuisance, trespass or any other liability or adverse condition on any other property, nor does Borrower know of any basis for such notice or claim; and (vii) there are no present environmental conditions or events or, to the best of Borrower's knowledge, after due inquiry and investigation, past environmental conditions or events on or near the Property that could be reasonably anticipated to materially adversely affect the value of the Property.

(b)   Borrower shall keep or cause the Property to be kept free from Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and

35

in compliance with all Environmental Laws) and in compliance with all Environmental Laws, shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances by all tenants (except those substances used by tenants in the ordinary course of their activities and in compliance with all Environmental Laws), invitees and trespassers, and, without limiting the generality of the foregoing, during the term of this Security Instrument, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos. If required by Lender or under any Environmental Law, Borrower shall maintain an Operations and Maintenance Program for the management of asbestos, lead-based paint, radon or any other Hazardous Substances at the Property.

(c)     Borrower shall promptly notify Lender if Borrower shall become aware of (i) any Release or threatened Release of Hazardous Substances at, on, under, from, or affecting or threatening to affect the Property (except those substances used by Borrower or tenants in the ordinary course of their business or activities, respectively, and in compliance with all Environmental Laws), (ii) any lien or filing of lien, action or notice affecting or threatening to affect the Property or Borrower resulting from any violation or alleged violation of Environmental Law, (iii) any investigation, inquiry or proceeding concerning Borrower or the Property pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) any occurrence, condition or state of facts which would render any representation or warranty in this Section incorrect in any respect if made at the time of such discovery. Further, promptly following receipt of the same, Borrower shall deliver to Lender copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential non-compliance with any Environmental Laws in connection with the Property or presence or existence of any Hazardous Substances at, on, about, under, within, near or in connection with the Property (except those substances used in the ordinary course of its business and in compliance with all Environmental Laws). Borrower shall, promptly and when and as required, at Borrower's sole cost and expense, take all actions as shall be necessary or advisable for compliance with the terms of this Section 1.30 or for the remediation of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment, remedial and response actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all remediation, response, administrative and enforcement costs of applicable governmental agencies which may be asserted against the Property. In the event Borrower fails to do so (i) Lender may, but shall not be obligated to, undertake remediation at the Property or other affected property necessary to bring the Property into conformance with the terms of Environmental Laws, and (ii) Borrower hereby grants to Lender and its agents and employees access to the Property and a license to do all things Lender shall deem necessary to bring the Property into conformance with Environmental Laws. Any and all costs and expenses reasonably incurred by Lender in connection therewith, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be promptly paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. BORROWER COVENANTS AND AGREES, AT BORROWER'S SOLE COST AND EXPENSE, TO INDEMNIFY, DEFEND (AT TRIAL AND APPELLATE LEVELS, AND

36

WITH ATTORNEYS, CONSULTANTS AND EXPERTS ACCEPTABLE TO LENDER), AND HOLD LENDER HARMLESS FROM AND AGAINST ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS', CONSULTANTS' AND EXPERTS' FEES AND DISBURSEMENTS ACTUALLY INCURRED IN INVESTIGATING, DEFENDING, SETTLING OR PROSECUTING ANY CLAIM, LITIGATION OR PROCEEDING) WHICH MAY AT ANY TIME BE IMPOSED UPON, INCURRED BY OR ASSERTED OR AWARDED AGAINST LENDER OR THE PROPERTY, AND ARISING DIRECTLY OR INDIRECTLY FROM OR OUT OF:  (i) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, IN, UNDER, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (ii) THE VIOLATION OF ANY ENVIRONMENTAL LAWS RELATING TO, AFFECTING OR THREATENING TO AFFECT THE PROPERTY, WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (iii) THE FAILURE BY BORROWER TO COMPLY FULLY WITH THE TERMS AND CONDITIONS OF THIS SECTION 1.30; (iv) THE BREACH OF ANY REPRESENTATION OR WARRANTY CONTAINED IN THIS SECTION 1.30; OR (v) THE ENFORCEMENT OF THIS SECTION 1.30, INCLUDING, WITHOUT LIMITATION, THE COST OF ASSESSMENT, CONTAINMENT AND/OR REMOVAL OF ANY AND ALL HAZARDOUS SUBSTANCES ON AND/OR FROM ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, THE COST OF ANY ACTIONS TAKEN IN RESPONSE TO THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, IN, UNDER OR AFFECTING ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS TO PREVENT OR MINIMIZE SUCH RELEASE OR THREAT OF RELEASE SO THAT IT DOES NOT MIGRATE OR OTHERWISE CAUSE OR THREATEN DANGER TO PRESENT OR FUTURE PUBLIC HEALTH, SAFETY, WELFARE OR THE ENVIRONMENT, AND COSTS INCURRED TO COMPLY WITH THE ENVIRONMENTAL LAWS IN CONNECTION WITH ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS.  THE INDEMNITY SET FORTH IN THIS SECTION 1.30(c) SHALL ALSO INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE PROPERTY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE PROPERTY BY REASON OF ANY MATTER SET FORTH IN THIS SECTION 1.30(c), AND ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATING TO INJURY OR DEATH DUE TO EXPOSURE FROM HAZARDOUS SUBSTANCES THAT MAY BE PRESENT OR RELEASED AT, ON, UNDER OR FROM THE PROPERTY.  LENDER'S RIGHTS UNDER THIS SECTION SHALL SURVIVE PAYMENT IN FULL OF THE INDEBTEDNESS SECURED HEREBY AND SHALL BE IN

37

ADDITION TO ALL OTHER RIGHTS OF LENDER UNDER THIS SECURITY INSTRUMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.

(d)    Upon Lender's request, at any time after the occurrence of a default hereunder or at such other time as Lender has reasonable grounds to believe that Hazardous Substances are or have been handled, generated, stored, processed, transported to or from, or released or discharged from or disposed of on or around, the Property (other than in the normal course of Borrower's or the tenants' business or activities, respectively, and in compliance with all Environmental Laws), or that Borrower or any tenant of the Property may be in violation of Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an inspection or audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant approved by Lender to determine whether there has been a Release or threatened Release of Hazardous Substances at, on, under, or from the Property onto adjoining properties and if the Property is in full compliance with Environmental Laws (including asbestos-containing material or lead-based paint). If Borrower fails to provide such inspection or audit within thirty (30) days after such request, Lender may order the same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit. The cost of such inspection or audit, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(e)    Borrower agrees that if prior to the date hereof, or if at any time hereafter, any inspection or audit reveals (or revealed, as applicable) the presence of Mold in the indoor air of the Property at concentrations exceeding ambient air levels or visible Mold on any building materials or surfaces at the Property for which the EPA Mold Guidelines recommends or requires removal thereof by remediation professionals, then, on or before thirty (30) days following (i) the date hereof, if such inspection or audit was made prior to the date hereof or (ii) such inspection or audit, if such inspection or audit is hereafter made, as applicable, Borrower shall, at its sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan (the "Mold O&M Plan") to monitor, maintain and remediate any water filtration and Mold issues affecting the Property, which plan shall be prepared by an expert, and be in form, scope and substance acceptable to Lender and sufficient to cause the Property to comply with all applicable laws and all EPA Mold Guidelines and in accordance with the Mold O&M Plan. If a Mold O&M Plan has been prepared prior to the date hereof, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof. Compliance with the Mold O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws. For purposes hereof, "EPA Mold Guidelines" shall mean the guidelines set forth in "Mold Remediation in Schools and Commercial Buildings" prepared by the U.S. Environmental Protection Agency

(f)    Without limiting the foregoing, Lender and its authorized representatives may, during normal business hours, upon reasonable advance notice and at its own expense,

inspect the Property and Borrower's records related thereto for the purpose of determining compliance with Environmental Laws and the terms and conditions of this Section 1.30.

(g)    As used herein, (i) the term "Release" shall include, without limitation, any intentional or unintentional placing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, discarding or abandoning of any Hazardous Substance, other than in the normal course of business or activities of Borrower or its tenants, and in compliance with all Environmental Laws; and (ii) the term "Mold" shall mean fungi that reproduces through the release of spores or the splitting of cells or other means, including but not limited to mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial volatile organic compounds.

(h)    Borrower agrees to implement and diligently and continuously carry out the operations, abatement and maintenance plan for asbestos ("Asbestos O&M Plan"), based on the report of LandAmerica Commercial Services dated March 28, 2006, to monitor, maintain and remediate asbestos at the Property. Compliance with the Asbestos O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

1.31    INDEMNIFICATION; SUBROGATION.

(a)    BORROWER SHALL INDEMNIFY, DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST: (i) ANY AND ALL CLAIMS FOR BROKERAGE, LEASING, FINDER'S OR SIMILAR FEES WHICH MAY BE MADE RELATING TO THE PROPERTY OR THE SECURED INDEBTEDNESS, (ii) ANY AND ALL LIABILITY, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, ACTIONS, SUITS, LIENS, CHARGES, ENCUMBRANCES, COSTS AND EXPENSES (INCLUDING LENDER'S ATTORNEYS' FEES, TOGETHER WITH APPELLATE COUNSEL FEES, IF ANY) OF WHATEVER KIND OR NATURE WHICH MAY BE ASSERTED AGAINST, IMPOSED ON OR INCURRED BY LENDER UNDER ANY LEASE, FOR ANY LOSS ARISING FROM A FAILURE OR INABILITY TO COLLECT RENTS AND PROFITS OR IN CONNECTION WITH THE SECURED INDEBTEDNESS, THIS SECURITY INSTRUMENT, THE PROPERTY, OR ANY PART THEREOF, OR THE EXERCISE BY LENDER OF ANY RIGHTS OR REMEDIES GRANTED TO IT UNDER THIS SECURITY INSTRUMENT, AND ANY DEFAULT UNDER THIS SECURITY INSTRUMENT, (iii) ANY LIENS (WHETHER JUDGMENTS, MECHANICS', MATERIALMEN'S OR OTHERWISE), CHARGES AND ENCUMBRANCES FILED AGAINST THE PROPERTY, AND (iv) ANY CLAIMS AND DEMANDS FOR DAMAGES OR INJURY, INCLUDING CLAIMS FOR PROPERTY DAMAGE, PERSONAL INJURY OR WRONGFUL DEATH, ARISING OUT OF OR IN CONNECTION WITH ANY ACCIDENT OR FIRE OR OTHER CASUALTY ON THE REAL ESTATE OR THE IMPROVEMENTS OR ANY NUISANCE OR TRESPASS MADE OR SUFFERED THEREON, INCLUDING, IN ANY CASE, ATTORNEYS' FEES, COSTS AND EXPENSES AS AFORESAID, WHETHER AT PRETRIAL, TRIAL OR APPELLATE LEVEL FOR ANY CIVIL, CRIMINAL OR ADMINISTRATIVE PROCEEDINGS.    SHOULD LENDER INCUR ANY LIABILITY UNDER THIS SECURITY INSTRUMENT OR ANY OF THE OTHER LOAN DOCUMENTS, THE AMOUNT THEREOF, INCLUDING, WITHOUT LIMITATION, COSTS, EXPENSES AND ATTORNEYS' FEES, TOGETHER WITH

39

INTEREST THEREON AT THE DEFAULT INTEREST RATE FROM THE DATE INCURRED BY LENDER UNTIL ACTUALLY PAID BY BORROWER, SHALL BE IMMEDIATELY DUE AND PAYABLE TO LENDER BY BORROWER ON DEMAND AND SHALL BE SECURED HEREBY AND BY ALL OF THE OTHER LOAN DOCUMENTS SECURING ALL OR ANY PART OF THE INDEBTEDNESS EVIDENCED BY THE NOTE. HOWEVER, NOTHING HEREIN SHALL BE CONSTRUED TO OBLIGATE BORROWER TO INDEMNIFY, DEFEND AND HOLD HARMLESS LENDER FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, ACTIONS, SUITS, COSTS AND EXPENSES ENACTED AGAINST, IMPOSED ON OR INCURRED BY LENDER BY REASON OF LENDER'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. THIS INDEMNITY SHALL SURVIVE PAYMENT IN FULL OF THE INDEBTEDNESS SECURED HEREBY.

(b)     Lender may engage the services of attorneys if it is made a party defendant to any litigation (or threatened action or claim) or to enforce the terms of this Security Instrument or to protect its rights hereunder, and in the event of any such engagement, Borrower shall pay Lender's attorneys' fees (together with reasonable appellate counsel fees, if any), consultants' fees, experts' fees, and expenses reasonably incurred by Lender, whether or not such action is actually commenced against Borrower. All references to "attorneys" in this subsection and elsewhere in this Security Instrument shall include, without limitation, any attorney or law firm engaged by Lender and Lender's in-house counsel, and all references to "fees and expenses" in this subsection and elsewhere in this Security Instrument shall include, without limitation, any fees of such attorney or law firm and any allocation charges and allocation costs of Lender's in-house counsel.

(c)     A waiver of subrogation shall be obtained by Borrower from its insurance carrier and, consequently, Borrower waives any and all right to claim or recover against Lender, its officers, employees, agents and representatives, for loss of or damage to Borrower, the Property, Borrower's property or the property of others under Borrower's control from any cause insured against or required to be insured against by the provisions of this Security Instrument.

1.32    Covenants with Respect to Indebtedness; Operations and Fundamental Changes of Borrower. Borrower represents, warrants and covenants as of the date hereof and until such time as the indebtedness secured hereby is paid in full, that Borrower:

(a)     does not own and will not own any encumbered asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

(b)     is not engaged and will not engage in any business other than the ownership, management and operation of the Property;

(c)     will not enter into any contract or agreement with any general partner, principal, member, manager or affiliate of Borrower or any affiliate of any such general partner, principal, member or manager of Borrower, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties other than an affiliate;

40

(d)    has not incurred and will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the secured indebtedness, and (ii) unsecured trade and operational debt incurred in the ordinary course of business; no debt whatsoever may be secured (senior, subordinate or pari passu) by the Property, except the indebtedness secured hereby;

(e)    has not made and will not make any loans or advances to any third party (including any general partner, principal, member, manager or affiliate of Borrower, or any guarantor);

(f)    is and will be solvent and pay its debts from its assets as the same shall become due;

(g)    has done or caused to be done and will do all things necessary to preserve its existence and corporate, limited liability company and partnership formalities (as applicable), and will not, nor will any partner, limited or general, or member or shareholder thereof, amend, modify or otherwise change its partnership certificate, partnership agreement, certificate or articles of incorporation or organization, or by-laws or operating agreement or regulations, in a manner which adversely affects Borrower's or any such partner's, member's or shareholder's existence as a single-purpose, single-asset "bankruptcy remote" entity;

(h)    will conduct and operate its business as presently conducted and operated;

(i)    will maintain books and records and bank accounts separate from those of its affiliates, including its general partners, principals and members;

(j)    will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Borrower, any constituent party of Borrower, any guarantor or any affiliate of any constituent party or guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business only in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks;

(k)    will file its own tax returns;

(l)    will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(m)    will not, nor will any shareholder, principal, partner, member, manager or affiliate, seek the dissolution or winding up, in whole or in part, of Borrower;

(n)    will not enter into any transaction of merger or consolidation, or acquire by purchase or otherwise all or substantially all of the business or assets of, or any stock or beneficial ownership of, any entity;

41

(o)    will not commingle the funds and other assets of Borrower with those of any general partner, principal, member, manager or affiliate, or any other person;

(p)    has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or any other person;

(q)    has, and any general partner or manager of Borrower has, at all times since its formation, observed all legal and customary formalities regarding its formation and will continue to observe all legal and customary formalities;

(r)    does not and will not hold itself out to be responsible for the debts or obligations of any other person; and

(s)    upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, shall not seek a supplemental stay or otherwise pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Act, or any other debtor relief law (whether statutory, common law, case law, or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against any guarantor or indemnitor of the secured obligations or any other party liable with respect thereto by virtue of any indemnity, guaranty or otherwise;

1.33    Litigation. Borrower will give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened (in writing) against Borrower which might have a Material Adverse Effect.

1.34    ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Security Instrument or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of this Security Instrument, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities within the meaning of 29 C.F.R. Section 2510.3-101(b)(2);

42

        (B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. Section 2510.3-101(f)(2); or

        (C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. Section 2510.3-101(c) or (e) or an investment company registered under the Investment Company Act of 1940.

    (c)    BORROWER SHALL INDEMNIFY LENDER AND DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CIVIL PENALTIES, EXCISE TAXES, OR OTHER LOSS, COST, DAMAGE AND EXPENSE (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND DISBURSEMENTS AND COSTS INCURRED IN THE INVESTIGATION, DEFENSE AND SETTLEMENT OF CLAIMS AND LOSSES INCURRED IN CORRECTING ANY PROHIBITED TRANSACTION OR IN THE SALE OF A PROHIBITED LOAN, AND IN OBTAINING ANY INDIVIDUAL PROHIBITED TRANSACTION EXEMPTION UNDER ERISA THAT MAY BE REQUIRED, IN LENDER'S SOLE DISCRETION) THAT LENDER MAY INCUR, DIRECTLY OR INDIRECTLY, AS A RESULT OF A DEFAULT UNDER THIS SECTION. THIS INDEMNITY SHALL SURVIVE ANY TERMINATION, SATISFACTION OR FORECLOSURE OF THIS SECURITY INSTRUMENT.

## ARTICLE II.

### EVENTS OF DEFAULT

    2.1    <u>Events of Default</u>. The occurrence of any of the following events shall be a "default" hereunder and the occurrence of any of the following events which is not cured within any applicable notice and/or cure period specified below shall be an **"Event of Default"** hereunder:

        (a)    Borrower fails to make any payment under the Note when due, subject to any grace period set forth therein.

        (b)    Borrower fails to punctually perform any covenant, agreement, obligation, term or condition hereof which requires payment of any money to Lender (except those regarding payments to be made under the Note, which failure is subject to any grace periods set forth in the Note).

        (c)    Borrower fails to provide insurance as required by <u>Section 1.4</u> hereof, financial statements, book and records as required under Sections 1.18 or Section 1.7(e) hereof, or fails to perform any covenant, agreement, obligation, term or condition set forth in <u>Section 1.16</u> or <u>Section 1.30</u> hereof.

        (d)    Borrower fails to perform any other covenant, agreement, obligation, term or condition set forth herein other than those otherwise described in this <u>Section 2.1</u> and, to the extent such failure or default is susceptible of being cured, the continuance of such failure or default for thirty (30) days after written notice thereof from Lender to Borrower; provided,

however, that if such default is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Borrower commences to cure such default promptly after receipt of notice thereof from Lender, and thereafter prosecutes the curing of such default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence, but not to exceed an additional sixty (60) days.

(e)     Any representation or warranty made herein, in or in connection with any application or commitment relating to the loan evidenced by the Note, or in any of the other Loan Documents to Lender by Borrower, by any principal, manager or general partner in Borrower or by any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby is determined by Lender to have been false or misleading in any material respect at the time made.

(f)     There shall be a sale, conveyance, disposition, alienation, hypothecation, leasing, assignment, pledge, mortgage, granting of a security interest in or other transfer or further encumbrancing of the Property, Borrower or its owners, or any portion thereof or any interest therein, in violation of Section 1.13 hereof.

(g)     A default occurs under any of the other Loan Documents which has not been cured within any applicable grace or cure period therein provided.

(h)     Borrower, any principal, general partner or manager (as applicable) in Borrower or any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby becomes insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors, shall file a petition in bankruptcy, shall voluntarily be adjudicated insolvent or bankrupt or shall admit in writing the inability to pay debts as they mature, shall petition or apply to any tribunal for or shall consent to or shall not contest the appointment of a receiver, trustee, custodian or similar officer for Borrower, for any such principal, general partner or manager (as applicable) of Borrower or for any such indemnitor or guarantor or for a substantial part of the assets of Borrower, of any such principal, general partner or manager of Borrower or of any such indemnitor or guarantor, or shall commence any case, proceeding or other action under any bankruptcy, reorganization, arrangement, readjustment or debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect.

(i)     A petition ("Petition") is filed or any case, proceeding or other action is commenced against Borrower, against any principal, general partner or manager of Borrower or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby seeking to have an order for relief entered against it as debtor or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or other relief under any law relating to bankruptcy, insolvency, arrangement, reorganization, receivership or other debtor relief under any law or statute of any jurisdiction, whether now or hereafter in effect, or a court of competent jurisdiction enters an order for relief against Borrower, against any principal, general partner or manager of Borrower or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby, as debtor, or an order, judgment or decree is entered appointing, with or without

44

the consent of Borrower, of any such principal, general partner or manager of Borrower or of any such indemnitor or guarantor, a receiver, trustee, custodian or similar officer for Borrower, for any such principal, general partner or manager of Borrower or for any such indemnitor or guarantor, or for any substantial part of any of the properties of Borrower, of any such principal, general partner or manager of Borrower or of any such indemnitor or guarantor, and if any such event shall occur, such petition, case, proceeding, action, order, judgment or decree shall not be dismissed within sixty (60) days after being commenced.

(j)     Borrower solicits or aids the solicitation of the filing of any Petition against Borrower, including, without limitation: (i) providing information regarding the identity of creditors or the nature of creditors' claims to any third party unless compelled to do so by order of a court of competent jurisdiction or by regulation promulgated by a governmental agency, or (ii) paying the legal fees or expenses of any creditor of or interest holder in Borrower with respect to any matter whatsoever.

(k)     The Property or any part thereof shall be taken on execution or other process of law in any action against Borrower.

(l)     Borrower abandons all or a portion of the Property.

(m)     The holder of any lien or security interest on the Property (without implying the consent of Lender to the existence or creation of any such lien or security interest), whether superior or subordinate to this Security Instrument or any of the other Loan Documents, declares a default and such default is not cured within any applicable grace or cure period set forth in the applicable document or such holder institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(n)     The Property, or any part thereof, is subjected to actual or threatened waste or to removal, demolition or material alteration so that the value of the Property is materially diminished thereby and Lender determines (in its subjective determination) that it is not adequately protected from any loss, damage or risk associated therewith.

(o)     Any dissolution, termination, partial or complete liquidation, merger or consolidation of Borrower or any of its principals, members, managers or general partners.

ARTICLE III.

## REMEDIES

3.1     Remedies Available. If there shall occur a default under this Security Instrument, and such default has not been cured within any applicable grace or cure period, then this Security Instrument is subject to foreclosure as provided by law and Lender may, at its option and by or through a trustee, nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

(a)     Acceleration. Accelerate the maturity date of the Note and declare any or all of the indebtedness secured hereby to be immediately due and payable without any

presentment, demand, protest, notice or action of any kind whatever (each of which is hereby expressly waived by Borrower), whereupon the same shall become immediately due and payable. Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable prepayment fee provided for in the Note shall then be immediately due and payable.

(b)    Entry on the Property.    Without in any way curing or waiving any default of Borrower, either in person, by agent or by court-appointed receiver, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Property, in its own name, without force or with such force as is permitted by law and without notice or process or with such notice or process as is required by law unless such notice and process is waivable, in which case Borrower hereby waives such notice and process, and do any and all acts and perform any and all work which may be desirable or necessary in Lender's judgment to complete any unfinished construction on the Real Estate, to preserve and/or enhance the value, marketability or rentability of the Property, to increase the income therefrom, to manage and operate the Property or to protect the security hereof and all sums expended by Lender therefor, together with interest thereon at the Default Interest Rate (as defined in the Note), shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(c)    Collect Rents and Profits.    With or without taking possession of the Property, sue for or otherwise collect the Rents and Profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including, without limitation, reasonable attorneys' fees, upon any indebtedness secured hereby, all in such order as Lender in its discretion may determine.

(d)    Appointment of Receiver.    Upon, or at any time prior or after, initiating the exercise of any power of sale , instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application, ex-parte, to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Borrower and without regard to the adequacy of the Property for the repayment of the indebtedness secured hereby or the solvency of Borrower or any person or persons liable for the payment of the indebtedness secured hereby, and Borrower does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender, but nothing herein is to be construed to deprive Lender of any other right, remedy or privilege Lender may now have under the law to have a receiver appointed; provided, however, that the appointment of such receiver, trustee or other appointee by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of Lender to receive payment of the Rents and Profits pursuant to other terms and provisions of this Security Instrument or the Assignment. Any such receiver shall have all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop, rent, lease, manage, maintain, operate and otherwise use or permit the use of the Property upon such terms and conditions as said receiver may deem to be prudent and

reasonable under the circumstances as more fully set forth in Section 3.3 below. Such receivership shall, at the option of Lender, continue until full payment of all of the indebtedness secured hereby or until title to the Property shall have passed by foreclosure sale under this Security Instrument or deed in lieu of foreclosure.

(e)    Foreclosure.    Immediately commence an action to foreclose this Security Instrument or to specifically enforce its provisions or any of the indebtedness secured hereby pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Lender.    In the event foreclosure proceedings are filed by Lender, all expenses incident to such proceedings, including, but not limited to, reasonable attorneys' fees and costs, shall be paid by Borrower and secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.    The secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate, any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), reasonable attorneys' fees and any other amounts due and unpaid to Lender under the Loan Documents, may be bid by Lender in the event of a foreclosure sale hereunder.    In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.

(f)    Other.    Exercise any other right or remedy available hereunder, under any of the other Loan Documents or at law or in equity.

3.2    Application of Proceeds.    To the fullest extent permitted by law, the proceeds of any sale under this Security Instrument shall be applied to the extent funds are so available to the following items in such order as Lender in its sole discretion may determine:

(a)    To payment of the costs, expenses and fees of taking possession of the Property, and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Lender's right and remedies hereunder and under the other Loan Documents, including, but not limited to, receivers' fees, court costs, attorneys', appraisers', auctioneers', managers' and other professional fees, title charges and transfer taxes.

(b)    To payment of all sums expended by Lender under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Interest Rate (as defined in the Note).

(c)    To payment of the secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate (as defined in the Note) and, to the extent permitted by applicable law, any prepayment fee, charge or premium required to be paid under the Note in order to prepay principal, in any order that Lender chooses in its sole discretion.

47

(d)    The remainder, if any, of such funds shall be disbursed to Borrower or to the person or persons legally entitled thereto.

3.3    Right and Authority of Receiver or Lender in the Event of Default; Power of Attorney.  Upon the occurrence of a default hereunder, which default is not cured within any applicable grace or cure period, and entry upon the Property pursuant to Section 3.1(b) hereof or appointment of a receiver pursuant to Section 3.1(d) hereof, and under such terms and conditions as may be prudent and reasonable under the circumstances in Lender's or the receiver's sole discretion, all at Borrower's expense, Lender or said receiver, or such other persons or entities as they shall hire, direct or engage, as the case may be, may do or permit one or more of the following, successively or concurrently:  (a) enter upon and take possession and control of any and all of the Property; (b) take and maintain possession of all documents, books, records, papers and accounts relating to the Property; (c) exclude Borrower and its agents, servants and employees wholly from the Property; (d) manage and operate the Property; (e) preserve and maintain the Property; (f) make repairs and alterations to the Property; (g) complete any construction or repair of the Improvements, with such changes, additions or modifications of the plans and specifications or intended disposition and use of the Improvements as Lender may in its sole discretion deem appropriate or desirable to place the Property in such condition as will, in Lender's sole discretion, make it or any part thereof readily marketable or rentable; (h) conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such terms and conditions as Lender may in its sole discretion deem appropriate or desirable; (i) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Lender may in its sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (j) execute and deliver, in the name of Lender as attorney-in-fact and agent of Borrower or in its own name as Lender, such documents and instruments as are necessary or appropriate to consummate authorized transactions; (k) enter into such leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as Lender may in its sole discretion deem appropriate or desirable; (l) collect and receive the Rents and Profits from the Property; (m) eject tenants or repossess personal property, as provided by law, for breaches of the conditions of their Leases or other agreements; (n) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Borrower or Lender; (o) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (p) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due; (q) delegate or assign any and all rights and powers given to Lender by this Security Instrument; and (r) do any acts which Lender in its sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable, as Lender may in its sole discretion deem appropriate or desirable to implement and effectuate the provisions of this Security Instrument.  This Security Instrument shall constitute a direction to and full authority to any lessee, or other third party who has heretofore dealt or contracted or may hereafter deal or contract with Borrower or Lender, at the request of Lender, to pay all amounts owing under any Lease, contract, concession, license or other agreement to Lender without proof of the default relied upon.  Any such lessee or third party is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected by Borrower in so doing) any request, notice or demand by Lender for the payment to Lender of any Rents and Profits or other sums which

48

may be or thereafter become due under its Lease, contract, concession, license or other agreement, or for the performance of any undertakings under any such lease, contract, concession, license or other agreement, and shall have no right or duty to inquire whether any default under this Security Instrument or under any of the other Loan Documents has actually occurred or is then existing. Borrower hereby constitutes and appoints Lender, its assignees, successors, transferees and nominees, as Borrower's true and lawful attorney-in-fact and agent, with full power of substitution in the Property, in Borrower's name, place and stead, to do or permit any one or more of the foregoing described rights, remedies, powers and authorities, successively or concurrently, and said power of attorney shall be deemed a power coupled with an interest and irrevocable so long as any indebtedness secured hereby is outstanding. Any money advanced by Lender in connection with any action taken under this Section 3.3, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date of making such advancement by Lender until actually paid by Borrower, shall be a demand obligation owing by Borrower to Lender and shall be secured by this Security Instrument and by every other instrument securing the secured indebtedness.

3.4     Occupancy After Foreclosure.  In the event there is a sale or sales pursuant to Section 3.1 hereof and at the time of such sale or sales, Borrower or Borrower's representatives, successors or assigns, or any other persons claiming any interest in the Property by, through or under Borrower (except tenants of space in the Improvements subject to Leases entered into prior to or after the date hereof), are occupying or using the Property, or any part thereof, then, to the extent not prohibited by applicable law, each and all shall, at the option of Lender or the purchaser at such sale, as the case may be, immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the Property occupied or used, such rental to be due daily to the purchaser.  Further, to the extent permitted by applicable law, in the event the tenant fails to surrender possession of the Property upon the termination of such tenancy, the purchaser shall be entitled to institute and maintain an action for unlawful detainer of the Property in the appropriate court of the county in which the Real Estate is located.

3.5     Notice to Account Debtors.  Lender may, at any time after a default hereunder, which default is not cured within any applicable grace or cure period, notify the account debtors and obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness to Borrower included in the Property to pay Lender directly. Borrower shall at any time or from time to time upon the request of Lender provide to Lender a current list of all such account debtors and obligors and their addresses.

3.6     Cumulative Remedies.  All remedies contained in this Security Instrument are cumulative and Lender shall also have all other remedies provided at law and in equity or in any other Loan Documents.  Such remedies may be pursued separately, successively or concurrently at the sole subjective direction of Lender and may be exercised in any order and as often as occasion therefor shall arise.  No act of Lender shall be construed as an election to proceed under any particular provisions of this Security Instrument to the exclusion of any other provision of this Security Instrument or as an election of remedies to the exclusion of any other remedy which may then or thereafter be available to Lender.  No delay or failure by Lender to exercise any

49

right or remedy under this Security Instrument shall be construed to be a waiver of that right or remedy or of any default hereunder. Lender may exercise any one or more of its rights and remedies at its option without regard to the adequacy of its security.

    3.7    Payment of Expenses. Borrower shall pay on demand all of Lender's expenses reasonably incurred in any efforts to enforce any terms of this Security Instrument, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Lender until actually paid by Borrower at the Default Interest Rate (as defined in the Note), and the same shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

ARTICLE IV.

<b><u>MISCELLANEOUS TERMS AND CONDITIONS</u></b>

    4.1    Time of Essence. Time is of the essence with respect to all provisions of this Security Instrument.

    4.2    Release of Security Instrument. If and when Borrower has paid all of the secured indebtedness as the same becomes due and payable, and in satisfaction of, the provisions of Section 1.35 of this Security Instrument, then, and in such event only, all rights under this Security Instrument shall terminate except for those provisions hereof which by their terms survive, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Lender in form at Borrower's cost. Borrower shall be responsible for the recordation of such release and payment of any recordation costs associated therewith.

    4.3    Action by Lender. Without affecting Borrower's liability for the payment of any of the indebtedness secured hereby, Lender may from time to time and without notice to Borrower: (a) release any person liable for the payment of the indebtedness secured hereby; (b) extend or modify the terms of payment of the indebtedness secured hereby; (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the indebtedness secured hereby; (d) recover any part of the Property; (e) consent in writing to the making of any subdivision map or plat thereof; (f) join in granting any easement therein; or (g) join in any extension agreement of this Security Instrument or any agreement subordinating the lien hereof.

    4.4    Notices. Any notice, report, demand or other instrument authorized or required to be given or furnished hereunder or as required by law ("**Notices**") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by deposit in the United States mail as first class certified mail, return receipt requested, postage paid; (c) by overnight nationwide commercial courier service; or (d) by telecopy transmission (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clauses (a) through (c) above, in each case, addressed to the party intended to receive the same at the following address(es):

50

Lender:                  Potomac Realty Capital, LLC
75 Second Avenue, Suite 605
Needham, Massachusetts 02494
Attention: Daniel Palmier
Telecopier: (781) 972-0172

with copies to:      Troutman Sanders LLP
1001 Haxall Point
Richmond, Virginia 23219
Attention: Bernice H. Cilley, Esquire
Telecopier: (804) 698-6008

Borrower:        Gaslight Commons Apartments Co., LLC
c/o Green Realty Development Company, LLC
81 Pondfield Road, Suite 334
Bronxville, New York 10708
Attention: Steven Green
Telecopier: (914) 253-8112

with a copy to:     Steckler, Gutman, Morrissey & Murray
11 Edgewood Lane
Purchase, New York 10577
Attention: John Murray, Esquire
Telecopier: (914) 253-8611

Any party may change the address to which any such Notice is to be delivered to any other address within the United States of America, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Section 4.4. All notices, demands and requests shall be effective upon personal delivery, or one (1) business day after being deposited with the private courier service, or two (2) business days after being deposited in the United States mail as required above. The inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery, shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, notice from Lender may also be given by the servicer for the Loan.

    4.5    Successors and Assigns. The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Borrower and the successors and assigns of Borrower, including all successors in interest in and to all or any part of the Property, and shall inure to the benefit of Lender, and its successors and assigns and shall constitute covenants running with the land. If Borrower consists of more than one person or entity, each will be jointly and severally liable to perform the obligations of Borrower.

51

4.6     Severability.  A determination that any provision of this Security Instrument is unenforceable or invalid shall not affect the enforceability or validity of any other provision.

4.7     Gender.  Within this Security Instrument, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.

4.8     Waiver; Discontinuance of Proceedings.  Lender may waive any single default by Borrower hereunder without waiving any other prior or subsequent default, and may remedy any default by Borrower without waiving the default remedied.  Neither the failure or delay by Lender in exercising any right, power or remedy upon any default by Borrower hereunder shall be construed as a waiver of such default or as a waiver of the right to exercise any such right, power or remedy at a later date.  No single or partial exercise by Lender of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.  No modification or waiver of any provision hereof nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.  No notice to nor demand on Borrower in any case shall of itself entitle Borrower to any other or further notice or demand in similar or other circumstances.  Acceptance by Lender of any payment in an amount less than the amount then due on any of the secured indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of a default hereunder.

4.9     Section Headings.  The headings of the sections and paragraphs of this Security Instrument are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.

4.10     GOVERNING LAW.     THIS SECURITY INSTRUMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ALABAMA, PROVIDED, HOWEVER, THAT TO THE EXTENT THAT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.

4.11     Counting of Days.  The term "days" when used herein shall mean calendar days. If any time period ends on a Saturday, Sunday or holiday officially recognized by the State within which the Real Estate is located, the period shall be deemed to end on the next succeeding business day.  The term "business day" or "Business Day" when used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

4.12     Application of the Proceeds of the Note.  To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Lender at Borrower's request and Lender shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

52

4.13    Unsecured Portion of Indebtedness.  If any part of the secured indebtedness cannot be lawfully secured by this Security Instrument or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is unsecured by this Security Instrument.

4.14    Cross Default.  A default hereunder which has not been cured within any applicable grace or cure period shall be a default under each of the other Loan Documents.

4.15    Interest After Sale.  In the event the Property or any part thereof shall be sold upon foreclosure as provided hereunder, to the extent permitted by law, the sum for which the same shall have been sold shall, for purposes of redemption (pursuant to the laws of the State in which the Property is located), bear interest at the Default Interest Rate.

4.16    Construction of this Document.  This document may be construed as a mortgage, security deed, deed of trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation or contract, or any one or more of the foregoing, in order to fully effectuate the liens and security interests created hereby and the purposes and agreements herein set forth.

4.17    No Merger.  It is the desire and intention of the parties hereto that this Security Instrument and the lien hereof do not merge in fee simple title to the Property.

4.18    Rights With Respect to Junior Encumbrances.  Any person or entity purporting to have or to take a junior mortgage or other lien upon the Property or any interest therein shall be subject to the rights of Lender to amend, modify, increase, vary, alter or supplement this Security Instrument, the Note or any of the other Loan Documents and to extend the maturity date of the indebtedness secured hereby and to increase the amount of the indebtedness secured hereby and to waive or forebear the exercise of any of its rights and remedies hereunder or under any of the other Loan Documents and to release any collateral or security for the indebtedness secured hereby, in each and every case without obtaining the consent of the holder of such junior lien and without the lien or security interest of this Security Instrument losing its priority over the rights of any such junior lien.

4.19    Lender May File Proofs of Claim.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or the principals, members or general partners in Borrower, or their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire secured indebtedness at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

4.20    After-Acquired Property.  All property acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by

53

Borrower and without further deed, conveyance or assignment become subject to the lien and security interest created by this Security Instrument.

4.21    No Representation.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Lender pursuant to the Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Lender.

4.22    Counterparts.  This Security Instrument may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

4.23    Personal Liability.  Notwithstanding anything to the contrary contained in this Security Instrument, the liability of Borrower for the indebtedness secured hereby and for the performance of the other agreements, covenants and obligations contained herein and in the other Loan Documents shall be limited as set forth in Section 1.09 of the Note; provided, however, that nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Act to file a claim for the full amount of the indebtedness secured hereby or to require that all collateral shall continue to secure all indebtedness owing to Lender in accordance with the Note, this Security Instrument and the other Loan Documents.

4.24    Recording and Filing.  Borrower will cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Lender shall reasonably request, and will pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges. Borrower shall reimburse Lender, or its servicing agent, for the costs incurred in obtaining a tax service company to verify the status of payment of taxes and assessments on the Property.

4.25    Entire Agreement and Modifications.  This Security Instrument and the other Loan Documents contain the entire agreements between the parties and supersede any prior agreements (oral or written), and may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.

4.26    Maximum Interest.  The provisions of this Security Instrument and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of the Note or otherwise, shall the amount paid, or agreed to be paid ("Interest"), to Lender for the use, forbearance or retention of the money loaned under the Note exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, performance or

54

fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under the Note in the inverse order of its maturity (whether or not then due) or at the option of Lender be paid over to Borrower, and not to the payment of Interest. All Interest (including any amounts or payments judicially or otherwise under law deemed to be Interest) contracted for, charged, taken, reserved, paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Note, including any extensions and renewal thereof, until payment in full of the principal balance of the Note so that the Interest thereon for such full term will not at any time exceed the maximum amount permitted by applicable law. This Section 4.26 will control all agreements between Borrower and Lender.

4.27    Application of Default Interest Rate Not a Waiver.  Application of the Default Interest Rate shall not be deemed to constitute a waiver of any default or any rights or remedies of Lender under this Security Instrument, any other Loan Document or applicable legal requirements, or a consent to any extension of time for the payment or performance of any obligation with respect to which the Default Interest Rate may be invoked.

4.28    Interest Payable by Lender.  Lender shall cause funds in the Impound Account, the Replacement Reserve, the Repair and the Remediation Reserve (collectively, the **"Funds"**) to be deposited into accounts in Lender's name (or such other account name as Lender may elect) at a financial institution or other depository selected by Lender (or its servicer) in its sole discretion (collectively, the **"Depository Institution"**).  Notwithstanding anything set forth herein to the contrary, no earnings or interest on the Funds shall be payable to Borrower

4.29    Further Stipulations.  The additional covenants, agreements and provisions set forth in Exhibit B attached hereto, if any, shall be a part of this Security Instrument and shall, in the event of any conflict between such further stipulations and any of the other provisions of this Security Instrument, be deemed to control.

4.30    Relationship of the Parties.  The relationship between Borrower and Lender is that of a borrower and a lender only and neither of those parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

4.31    Fixture Filing.  This Security Instrument shall be effective from the date of its recording as a financing statement filed as a fixture filing with respect to all goods constituting part of the Property which are or are to become fixtures. The mailing address of Borrower and the address of Lender from which information concerning the security interests may be obtained are set forth in Section 1.22 above.

4.32    Cooperation With Rating Agencies and Investors.  Borrower covenants and agrees that in the event Lender decides to include the Loan as an asset of a Secondary Market Transaction, Borrower shall (a) at Lender's request, meet with representatives of the Rating

Agencies and/or investors to discuss the business and operations of the Property, (b) permit Lender or its representatives to provide related information to the Rating Agencies and/or investors, and (c) cooperate with the reasonable requests of the Rating Agencies and/or investors in connection with all of the foregoing.

4.33   State-Specific Provisions.

(A)   Acceleration; Remedies.  At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the secured indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any one or more other remedies permitted by applicable law or provided in this Security Instrument or in any other Loan Document.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

If Lender invokes the power of sale, Lender shall mail a copy of a notice of sale to Borrower in the manner provided in Section 4.4.  Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Montgomery County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of that County.  Lender may sell the Property in one or more parcels and in such order as Lender may determine.  Lender may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by re-publication of notice announcing the new sale date.  Lender or Lender's designee may purchase the Property at any sale.

Lender shall deliver to the purchaser Lender's deed conveying the Property so sold without any covenant or warranty, express or implied.  The recitals in Lender's deed shall be prima facie evidence of the truth of the statements made in those recitals.  Borrower covenants and agrees that the proceeds of any sale shall be applied in the following order or as otherwise prescribed by law:  (a) to all costs and expenses of the sale, including attorneys' fees and costs of title evidence; (b) to the secured indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to it.

(B)   Defeasance.  Upon payment of the secured indebtedness, this Security Instrument shall become null and void, and Lender shall release this Security Instrument.  Borrower shall pay Lender's reasonable costs incurred in releasing this Security Instrument.

(C)   Waiver of Exemptions.  Borrower waives all rights of exemptions as to personal property.  If Borrower is an individual, Borrower represents and warrants to Lender that the Mortgaged Property is not the homestead of Borrower or Borrower's spouse.

(D)   **WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THI SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY**

56

JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH
RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL
BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND
VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.


[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Security Instrument under seal as of the day and year first above written.

**BORROWER:**

**GASLIGHT COMMONS APARTMENTS CO.,**
LLC, a Delaware limited liability company

By _____

    Name:  Steven Green
    Title:  Sole Member


Address:

c/o Green Realty Development Company, LLC
81 Pondfield Road, Suite 334
Bronxville, New York 10708

58

**ACKNOWLEDGMENT**

STATE OF NEW YORK , WESTCHESTER County ss:

On this 20th day of April ___, 2006, I, John M. Murray , a Notary Public in and for said county and in said state, hereby certify that Steven Green, the Sole Member of Gaslight Commons Apartments Co., LLC, a Delaware limited liability company signed the foregoing instrument as such Sole Member of said limited liability company and with full authority, executed the same voluntarily for and as the act of said limited liability company on the day the same bears date.

Given under my hand and seal of office.

My commission expires:

_John M. Murray_
Notary Public

JOHN M. MURRAY
Notary Public, State of New York
No. 4618009
Qualified in Westchester County
Commission Expires May 31, 2021

59

**EXHIBIT A**

Legal Description
(Gaslight Commons Apartments)


Parcel C, according to the Map of Carriage Hills, Plat C, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama in Plat Book 23, at page 9.

Parcel D, according to the Map of Carriage Hills, Plat D, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama in Plat Book 23, at page 207.

A-1

**EXHIBIT B**

Deferred Maintenance Schedule

Gaslight Commons Renovation Summary 3.28.06:
Revised 4.17.06

| | |
|---|---|
| Balance Due Randazzo as of 4/1: | $224,781.25 |
| Less: 4/17 payments: | (130,000.00) |
| Balance Due: | $ 94,781.25 |
| Fencing | 40,000.00 est. |
| Landscaping | 35,000.00 est. |
| Pool Furniture | 12,000.00 est. |
| Office Furniture | 15,000.00 |
| Signage (bal) | 19,330.00 |
| Brochures & Floorplan Posters | 5,000.00 |
| Subtotal: | $221,111.25 |
| Clubhouse Repairs & Upgrades | 40,000.00 |
| Concrete Walks & Steps & Misc. | 10,000.00 |
| Total: | $271,111.25 |



STATE OF ALABAMA
MONTGOMERY CO.
I CERTIFY THIS INSTRUMENT
WAS FILED ON

2006 APR 25  PM 12: 50

REESE McKINNEY, JR.
JUDGE OF PROBATE

B-1

# EXHIBIT "C"

Gaslight Commons Apartments
Loan Number: 10084

## INDEMNITY AND GUARANTY AGREEMENT

**THIS INDEMNITY AND GUARANTY AGREEMENT** (this "**Agreement**"), made as of April 21, 2006, by **STEVEN GREEN**, (the "**Indemnitor**"), whose address is 81 Pondfield Road, Suite 334, Bronxville, New York 10708, in favor of **POTOMAC REALTY CAPITAL, LLC**, a Delaware limited liability company (the "**Lender**"), whose address 75 Second Avenue, Suite 605, Needham, Massachusetts, 02494, Attention: Daniel Palmier.

## W I T N E S S E T H:

WHEREAS, Gaslight Commons Apartments Co., LLC, a Delaware limited liability company ("**Borrower**"), has obtained a loan in the principal amount of Eleven Million and 00/100 Dollars ($11,000,000.00) (the "**Loan**") from Lender; and

WHEREAS, the Loan is evidenced by a Promissory Note dated of even date herewith (the "**Note**"), executed by Borrower and payable to the order of Lender in the stated principal amount of Eleven Million and 00/100 Dollars ($11,000,000.00) and is secured by, among other things, a Mortgage and Security Agreement dated as of the date hereof (the "**Security Instrument**") from Borrower to Lender, encumbering that certain real property situated in the County of Montgomery, State of Alabama, as more particularly described on Exhibit A attached hereto and incorporated herein by this reference, together with the buildings, structures and other improvements now or hereafter located thereon (said real property, buildings, structures and other improvements being hereinafter collectively referred to as the "**Property**") and by other documents and instruments (the Note, the Security Instrument and such other documents, agreements and instruments, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "**Loan Documents**"); and

WHEREAS, as a condition to making the Loan to Borrower, Lender has required that Indemnitor indemnify Lender from and against and guarantee payment to Lender of those items for which Borrower is personally liable and for which Lender has recourse against Borrower under the terms of the Note and the Security Instrument; and

WHEREAS, each of the parties comprising Indemnitor is an owner of a beneficial interest in Borrower, the extension of the Loan to Borrower is of substantial benefit to Indemnitor, and, therefore, Indemnitor desires to indemnify Lender from and against and guarantee payment to Lender of those items for which Borrower is personally liable and for which Lender has recourse against Borrower under the terms of the Note and the Security Instrument.

NOW, THEREFORE, to induce Lender to extend the Loan to Borrower and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitor hereby covenants and agrees for the benefit of Lender, as follows:

1

1.    _Indemnity and Guaranty_. Indemnitor hereby assumes liability for, hereby guarantees payment to Lender of, hereby agrees to pay, protect, defend and save Lender harmless from and against, and hereby indemnifies Lender from and against any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, attorneys' fees at both the trial and appellate levels), causes of action, suits, claims, demands and judgments of any nature or description whatsoever (collectively, "**Costs**") which may at any time be imposed upon, incurred by or awarded against Lender as a result of:

(a)    fraud or material misrepresentation or failure to disclose a material fact by Borrower, any of Borrower's officers, agents, attorneys, principals, general partners, managing members or employees, or any guarantor or indemnitor in connection with the Loan, including without limitation, the origination of the Loan and the performance of Borrower's obligations under the Loan Documents;

(b)    the gross negligence or willful misconduct of Borrower;

(c)    physical waste of the Property;

(d)    the breach of any representation, warranty, covenant or indemnification provision in the Loan Documents concerning environmental laws, hazardous substances or asbestos;

(e)    the removal or disposal of any portion of the Property after an Event of Default;

(f)    the misapplication or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, (C) any Rents (as defined in the Security Instrument) following an Event of Default, or (D) any Rents paid more than one month in advance;

(g)    the failure to pay or cause to be paid taxes and assessments affecting the Property or charges for labor or materials or other charges that can create liens on any portion of the Property (A) taxes and assessments affecting the Property, except when the gross revenue generated from the Property is insufficient to pay for same, or (B) charges for labor or materials or other charges that can create liens on any portion of the Property (other than Taxes);

(h)    any and all tenant security deposits held by Borrower not being properly applied or returned to tenants when due or delivered to Lender; and

(i)    the failure to obtain and maintain the fully paid for insurance in accordance with Section 1.4 of the Security Instrument.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness or to require that all collateral shall continue to secure all of the indebtedness

2

owing to Lender in accordance with the Loan Documents, and (ii) Indemnitor shall be liable for the full amount of the such indebtedness in the event that (A) the first full monthly payment of principal and interest on the Note is not paid when due; (B) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with Section 1.32 of the Security Instrument (except with respect to the terms and provisions of clauses (f) and (l) thereof, (C) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Property; (D) there occurs a transfer, encumbrance or other conveyance that is prohibited by the terms and provisions of Section 1.13 of the Security Instrument without the prior written consent of Lender, (E) a receiver, liquidator or trustee of Borrower or Indemnitor shall be appointed or if Borrower or Indemnitor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or Indemnitor or if any proceeding for the dissolution or liquidation of Borrower or Indemnitor shall be instituted by Borrower or Indemnitor, or (F) Indemnitor (or any person comprising Indemnitor), Borrower or any party holding a direct or indirect interest in Indemnitor or Borrower shall, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with this Agreement, the Note, the Security Instrument or any of the other Loan Documents, asserts a defense, seeks judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan which the court in such action or proceeding determines is without merit (in respect of a defense) or unwarranted (in respect of a request for judicial intervention or injunctive or other equitable relief).

This is a guaranty of payment and performance and not of collection. The liability of Indemnitor under this Agreement shall be absolute, direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the collateral for the Loan. Indemnitor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any collateral for the Loan or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person. In the event, on account of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of or fail to incur any debt, obligation or liability as provided in the Loan Documents, Indemnitor shall nevertheless be fully liable therefor. In the event of a default under the Loan Documents which is not cured within any applicable grace or cure period, Lender shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the collateral for the Loan) thereunder or hereunder, in any order, and all rights, powers and remedies available to Lender in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. If the indebtedness and obligations guaranteed hereby are partially paid or discharged by reason of the exercise of any of the remedies available to Lender, this Agreement shall nevertheless remain in full force and effect, and, subject to the terms hereof, Indemnitor shall remain liable for all remaining indebtedness and obligations guaranteed hereby, even though any rights which

Indemnitor may have against Borrower may be destroyed or diminished by the exercise of any such remedy.

2.    Indemnification Procedures.

(a)    If any action shall be brought against Lender based upon any of the matters for which Lender is indemnified hereunder, Lender shall notify Indemnitor in writing thereof and Indemnitor shall promptly assume the defense thereof, including, without limitation, the employment of counsel acceptable to Lender and the negotiation of any settlement; provided, however, that any failure of Lender to notify Indemnitor of such matter shall not impair or reduce the obligations of Indemnitor hereunder. Lender shall have the right, at the expense of Indemnitor (which expense shall be included in Costs), to employ separate counsel in any such action and to participate in the defense thereof. In the event Indemnitor shall fail to discharge or undertake to defend Lender against any claim, loss or liability for which Lender is indemnified hereunder, Lender may, at its sole option and election, defend or settle such claim, loss or liability. The liability of Indemnitor to Lender hereunder shall be conclusively established by such settlement, provided such settlement is made in good faith, the amount of such liability to include both the settlement consideration and the costs and expenses, including, without limitation, attorneys' fees and disbursements (at both the trial and appellate levels), incurred by Lender in effecting such settlement. In such event, such settlement consideration, costs and expenses shall be included in Costs and Indemnitor shall pay the same as hereinafter provided. Lender's good faith in any such settlement shall be conclusively established if the settlement is made on the advice of independent legal counsel for Lender.

(b)    Indemnitor shall not, without the prior written consent of Lender: (i) settle or compromise any action, suit, proceeding or claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to Lender of a full and complete written release of Lender (in form, scope and substance satisfactory to Lender in its sole discretion) from all liability in respect of such action, suit, proceeding or claim and a dismissal with prejudice of such action, suit, proceeding or claim; or (ii) settle or compromise any action, suit, proceeding or claim in any manner that may adversely affect Lender or obligate Lender to pay any sum or perform any obligation as determined by Lender in its sole discretion.

(c)    All Costs shall be immediately reimbursable to Lender when and as incurred and, in the event of any litigation, claim or other proceeding, without any requirement of waiting for the ultimate outcome of such litigation, claim or other proceeding, and Indemnitor shall pay to Lender any and all Costs within ten (10) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice. In addition to any other remedy available for the failure of Indemnitor to periodically pay such Costs, such Costs, if not paid within said ten-day period, shall bear interest at the Default Interest Rate (as defined in the Note).

3.    Reinstatement of Obligations. If at any time all or any part of any payment made by Indemnitor or received by Lender from Indemnitor under or with respect to this Agreement is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Indemnitor

4

or Borrower), then the obligations of Indemnitor hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous payment made by Indemnitor, or receipt of payment by Lender, and the obligations of Indemnitor hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment by Indemnitor had never been made.

4.    Waivers by Indemnitor.  To the extent permitted by law, Indemnitor hereby waives and agrees not to assert or take advantage of:

(a)    Any right to require Lender to proceed against Borrower or any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Indemnitor hereunder;

(b)    The defense of the statute of limitations in any action hereunder;

(c)    Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(d)    Demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notices of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Indemnitor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

(e)    Any defense based upon an election of remedies by Lender;

(f)    Any right or claim of right to cause a marshaling of the assets of Indemnitor;

(g)    Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Agreement;

(h)    Any duty on the part of Lender to disclose to Indemnitor any facts Lender may now or hereafter know about Borrower or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Indemnitor intends to assume or has reason to believe that such facts are unknown to Indemnitor or has a reasonable opportunity to communicate such facts to Indemnitor, it being understood and agreed that Indemnitor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property and of any and all circumstances bearing on the risk that liability may be incurred by Indemnitor hereunder;

5

(i)    Any lack of notice of disposition or of manner of disposition of any collateral for the Loan;

(j)    Any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(k)    Any lack of commercial reasonableness in dealing with the collateral for the Loan;

(l)    Any deficiencies in the collateral for the Loan or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(m)    An assertion or claim that the automatic stay provided by 11 U.S.C. §362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter acquired, which Lender may have against Indemnitor or the collateral for the Loan;

(n)    Any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise;

and

(o)    Any action, occurrence, event or matter consented to by Indemnitor under Section 5(h) hereof, under any other provision hereof, or otherwise.

5.    <u>General Provisions; Fully Recourse</u>.  All of the terms and provisions of this Agreement are recourse obligations of Indemnitor and not restricted by any limitation on personal liability.

(a)    <u>Unsecured Obligations</u>.  Indemnitor hereby acknowledges that Lender's appraisal of the Property is such that Lender is not willing to accept the consequences of the inclusion of Indemnitor's indemnity set forth herein among the obligations secured by the Security Instrument and the other Loan Documents and that Lender would not make the Loan but for the unsecured personal liability undertaken by Indemnitor herein.

(b)    <u>Survival</u>.  This Agreement shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the exercise of any remedy by Lender under the Security Instrument or any of the other Loan Documents, including, without limitation, any foreclosure or deed in lieu thereof, even if, as a part of such remedy, the Loan is paid or satisfied in full.

6

     (c)    <u>No Subrogation; No Recourse Against Lender</u>.  Notwithstanding the satisfaction by Indemnitor of any liability hereunder, Indemnitor shall not have any right of subrogation, contribution, reimbursement or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any collateral for the Loan.  In connection with the foregoing, Indemnitor expressly waives any and all rights of subrogation to Lender against Borrower, and Indemnitor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any collateral for the Loan.  In addition to and without in any way limiting the foregoing, Indemnitor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Indemnitor to all indebtedness of Borrower to Lender, and agrees with Lender that Indemnitor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Indemnitor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the collateral from the Loan.  Further, Indemnitor shall not have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Agreement or under the provisions of any of the Loan Documents.

     (d)    <u>Reservation of Rights</u>.  Nothing contained in this Agreement shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Indemnitor or any other party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified at Title 42 U.S.C. §9601 <u>et seq</u>.), as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

     (e)    <u>Net Worth and Liquidity; Financial Statements</u>.  Indemnitor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to maintain a net worth of no less than the outstanding principal balance of the Loan, for so long as any portion of the Loan shall remain outstanding, and to furnish to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Indemnitor certified by Indemnitor, in form and substance acceptable to Lender. Indemnitor hereby warrants and represents unto Lender that any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Indemnitor did or will at the time of such delivery fairly and accurately present the financial condition of Indemnitor.

     (f)    <u>Rights Cumulative; Payments</u>.  Lender's rights under this Agreement shall be in addition to all rights of Lender under the Note, the Security Instrument and the other Loan Documents.  FURTHER, PAYMENTS MADE BY INDEMNITOR UNDER THIS AGREEMENT SHALL NOT REDUCE IN ANY RESPECT BORROWER'S OBLIGATIONS AND LIABILITIES UNDER THE NOTE, THE SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS.

     (g)    <u>No Limitation on Liability</u>.  Indemnitor hereby consents and agrees that Lender may at any time and from time to time without further consent from Indemnitor do any of the following events, and the liability of Indemnitor under this Agreement shall be unconditional and absolute and shall in no way be impaired or limited by any of the following events, whether occurring with or without notice to Indemnitor or with or without consideration: (i) any extensions of time for performance required by any of the Loan Documents or extension or

renewal of the Note; (ii) any sale, assignment or foreclosure of the Note, the Security Instrument or any of the other Loan Documents or any sale or transfer of the Property; (iii) any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Indemnitor from any current or future position of ownership, management or control of Borrower; (iv) the accuracy or inaccuracy of the representations and warranties made by Indemnitor herein or by Borrower in any of the Loan Documents; (v) the release of Borrower or of any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; (vi) the release or substitution in whole or in part of any security for the Loan; (vii) Lender's failure to record the Security Instrument or to file any financing statement (or Lender's improper recording or filing thereof) or to otherwise perfect, protect, secure or insure any lien or security interest given as security for the Loan; (viii) the modification of the terms of any one or more of the Loan Documents; or (ix) the taking or failure to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents or any collateral for the Loan, nor any course of dealing with Borrower or any other person, shall limit, impair or release Indemnitor's obligations hereunder, affect this Agreement in any way or afford Indemnitor any recourse against Lender. Nothing contained in this Section shall be construed to require Lender to take or refrain from taking any action referred to herein.

(h)    Entire Agreement; Amendment; Severability.    This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements, whether written or oral, between the parties respecting such matters. Any amendments or modifications hereto, in order to be effective, shall be in writing and executed by the parties hereto. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provisions, and any determination that the application of any provision of this Agreement to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

(i)    Governing Law; Binding Effect; Waiver of Acceptance.    This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, except to the extent that the applicability of any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling. This Agreement shall bind Indemnitor and the heirs, personal representatives, successors and assigns of Indemnitor and shall inure to the benefit of Lender, its successors and assigns, and the officers, directors, shareholders, agents and employees of Lender and their respective heirs, successors and assigns. Notwithstanding the foregoing, Indemnitor shall not assign any of its rights or obligations under this Agreement without the prior written consent of Lender, which consent may be withheld by Lender in its sole discretion. Indemnitor hereby waives any acceptance of this Agreement by Lender, and this Agreement shall immediately be binding upon Indemnitor.

(j)    Notice.    All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Security Instrument, provided that the address of Indemnitor shall be as follows:

8

81 Pondfield Road, Suite 334
Bronxville, New York 10708
Telecopier: (914) 253-8112

(k)    <u>No Waiver; Time of Essence; Business Day</u>.    The failure of any party hereto to enforce any right or remedy hereunder, or to promptly enforce any such right or remedy, shall not constitute a waiver thereof nor give rise to any estoppel against such party nor excuse any of the parties hereto from their respective obligations hereunder. Any waiver of such right or remedy must be in writing and signed by the party to be bound. This Agreement is subject to enforcement at law or in equity, including actions for damages or specific performance. Time is of the essence hereof. The term "business day" as used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

(l)    <u>Captions for Convenience</u>. The captions and headings of the sections and paragraphs of this Agreement are for convenience of reference only and shall not be construed in interpreting the provisions hereof.

(m)    <u>Attorneys' Fees</u>.    In the event it is necessary for Lender to retain the services of an attorney or any other consultants in order to enforce this Agreement, or any portion thereof, Indemnitor agrees to pay to Lender any and all costs and expenses, including, without limitation, attorneys' fees (at both the trial and appellate levels), incurred by Lender as a result thereof and such costs, fees and expenses shall be included in Costs.

(n)    <u>Successive Actions</u>.    A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Indemnitor under this Agreement. Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time. No action hereunder shall preclude any subsequent action, and Indemnitor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

(o)    <u>Reliance</u>.    Lender would not make the Loan to Borrower without this Agreement. Accordingly, Indemnitor intentionally and unconditionally enters into the covenants and agreements as set forth above and understands that, in reliance upon and in consideration of such covenants and agreements, the Loan shall be made and, as part and parcel thereof, specific monetary and other obligations have been, are being and shall be entered into which would not be made or entered into but for such reliance.

(p)    <u>Waivers by Indemnitor</u>.

(i)    Indemnitor covenants and agrees that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower or any other indemnitor relative to the Loan or the Costs, Indemnitor shall not seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law, (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or

9

hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against Indemnitor or the collateral for the Loan by virtue of this Agreement or otherwise.

(ii)    Indemnitor covenants and agrees that it shall not solicit or aid the solicitation of the filing of any Petition (as defined in the Security Instrument) against Borrower, whether acting on its own behalf or on behalf of any other party, including, without limitation, (i) providing information regarding the identity of creditors or the nature of creditors' claims to any third party unless compelled to do so by order of a court of competent jurisdiction or by regulation promulgated by a governmental agency; or (ii) paying the legal fees or expenses of any creditor of or interest holder in Borrower with respect to any matter whatsoever.

(q)    Joint and Several Liability.    Notwithstanding anything to the contrary herein, the representations, warranties, covenants and agreements made by each of the persons comprising Indemnitor herein, and the liability of each of the persons comprising Indemnitor hereunder, is joint and several.

6.    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(i)    INDEMNITOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (A) SUBMITS TO PERSONAL JURISDICTION IN THE STATE WHERE THE PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS AGREEMENT, (B) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY WHERE THE PROPERTY IS LOCATED, (C) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (D) AGREES THAT INDEMNITOR WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).    TO THE FULL EXTENT PERMITTED BY LAW, INDEMNITOR FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO INDEMNITOR AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 5(k) HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(ii)    INDEMNITOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY

IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR INDEMNITOR, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR INDEMNITOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

7.     Individual Guarantor.

Steven Green represents and warrants that he is unmarried and a resident of the State of New York.

[signature page follows]

11

IN WITNESS WHEREOF, Indemnitor, intending to be legally bound hereby, has executed this Indemnity and Guaranty Agreement under seal as of the day and year first hereinabove set forth.

**INDEMNITOR:**

STEVEN GREEN

**EXHIBIT A**

Legal Description
(Gaslight Commons Apartments)


Parcel C, according to the Map of Carriage Hills, Plat C, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama in Plat Book 23, at page 9.

Parcel D, according to the Map of Carriage Hills, Plat D, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama in Plat Book 23, at page 207.

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602004391
Cashier ID: khaynes
Transaction Date: 03/21/2008
Payer Name: SIROTE AND PERMUTT PC
------------------------------------
CIVIL FILING FEE
 For: SIROTE AND PERMUTT PC
 Case/Party: D-ALM-2-08-CV-000204-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 235148
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

POTOMAC REALTY V. GREEN